EMILIO RIVERA MALDONADO, demandante y apelante, *v.* CENTRAL PASTO VIEJO, INC., demandada y apelada.

No. 5651.—*Resuelto:* Diciembre 16, 1932.

*F. Gallardo Díaz,* abogado del apelante; *Walter M. Newsom Jr., J. Henri Brown* y *R. Castro Fernández,* abogados de la apelada.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

La parte demandada, por conducto de uno de sus abogados, ha solicitado la reconsideración de la sentencia dictada por esta corte (43 D.P.R. 711), revocando la dictada por la Corte de Distrito de Humacao. Los argumentos que sirven de base a la demandada y apelada para presentar su moción de reconsideración son los siguientes:

"1.—Si la Corte estimó que el Juez sentenciador no resolvió conflicto de prueba en cuanto a las cuestiones controvertidas y no cumplió con el deber de declarar los hechos probados como fundamento de la sentencia, según exige la ley, entonces el caso no estaba en condiciones para revisar la sentencia en apelación y procedía enviar el caso de nuevo a la corte inferior para que el Juez sentenciador cumpliera con los requisitos legales.

"2.—Si la sentencia de esta Corte se funda en la proposición de que la falta de parar, mirar y escuchar por parte del demandante no constituye negligencia que fuera la causa próxima del accidente, la sentencia está en contra de la ley.

"3.—Si la Corte Suprema sienta como fundamento de la sentencia que la prueba no era suficiente para sostener la conclusión de la Corte sentenciadora de que el demandante no paró, miró ni escuchó, tal fundamento estaría en contra de los hechos ayudados por el conocimiento judicial, y además no concedería la debida fuerza a la inspección ocular practicada por el Juez sentenciador."

■■ Examinaremos en primer lugar las conclusiones y argumentos que sirven de base al fallo por nosotros revocado. La corte *a quo,* luego de expresar sus grandes dudas de que el demandante, si en verdad paró su automóvil, miró y trató de oír, no oyera el tren que se aproximaba y que tan cerca de él estaba, aun suponiendo que la locomotora no avisara por medio del pito y la campana, se vale del siguiente silogismo para formular sus conclusiones:

"Si aceptamos la teoría de la demandada, de que sus empleados tocaron el pito y la campana al acercarse al cruce, es claro y evidente que el demandante fué negligente al tratar de cruzar el paso a nivel, teniendo aviso de que el tren se aproximaba; si por el contrario asumiéramos que el demandante paró su carro, miró y trató de oír, nos parece inexplicable cómo durante el silencio de la noche, dada la situación de la vía en relación con la carretera y la proximidad del tren, él y su compañero no se dieran cuenta, por el ruido de la máquina, de que el ferrocarril se encontraba cerca y de que era una imprudencia de su parte el tratar de cruzar la vía en aquellos momentos, ya que una persona cuidadosa, como lo exige la ley y la jurisprudencia, hubiese esperado hasta cerciorarse de una manera cierta y categórica, de que el tren estaba próximo a pasar o cruzar por el paso a nivel que él trataba de utilizar también en aquellos momentos."

El silogismo que antecede conduce a la conclusión inevitable de que el demandante fué culpable de negligencia contribuyente. De acuerdo con la opinión de la corte inferior, si se tocó pito y campana por los empleados de la demandada, el demandante fué negligente al tratar de cruzar el paso a nivel; si por el contrario se asume que el demandante paró su carro, miró y trató de oír, entonces resulta inexplicable para la corte *a quo* que dicho demandante no se diera cuenta por el ruido de la máquina de que el ferrocarril se encontraba

cerca y de que era una imprudencia tratar de cruzar la vía en aquellos momentos. Conforme a esta teoría es muy difícil que una víctima de un accidente ferroviario ocurrido en el cruce de un camino público durante las horas de la noche pueda escapar a la inculpación de que fué negligente, porque si se toca pito y campana ha debido oír, y si no se toca pito y campana ha debido oír también el ruido de la locomotora que se aproxima. El silogismo de la corte inferior se parece mucho a otro silogismo que hemos encontrado en el caso de *Mayes* v. *Southern Ry. Co.*, 26 S. E. 148, resuelto por la Corte Suprema de North Carolina. De la opinión de la corte en este caso extractamos lo que sigue:

"La excepción a las instrucciones al jurado y las tres primeras excepciones por la negativa a dar las solicitadas, presentan substancialmente la misma proposición, de que aunque el demandante miró y escuchó, y no vió ni oyó el tren que se aproximaba, sin embargo, si pudo haber visto y oído, es negligencia contribuyente. Si por esto se tuvo el propósito de pedir a la Corte que instruyera al jurado que el demandante no estaba excusado si miró y escuchó descuidada y negligentemente, debió haberse puntualizado y plenamente solicitado. Además esto fué cubierto substancialmente por la instrucción sometida 'de que era el deber del demandante usar cuidado ordinario y razonable para evitar el accidente, y ejercer sus sentidos de vista y oído, y mantenerse observando los trenes que se aproximaban y si no lo hizo, y sin prestar atención se internó en la vía, sin mantenerse observando o escuchando los trenes que se aproximaban, esto es negligencia contribuyente.' Esta instrucción repetida tres veces en diferentes frases, fué realmente errónea para el demandante apelado, porque lo hace culpable de negligencia contribuyente por no mirar y escuchar en todos los casos aun si no había luz en el frente del tren en marcha y si no se tocó campana. Sin embargo, si tal fué el caso (y el demandante lo alegó y ofreció prueba de ello) la falta del demandante parar, mirar y escuchar en un cruce no fué negligencia contribuyente. Pero nosotros no entendemos que el demandado se querella de que no se instruyó al jurado que mirar y escuchar debe hacerse con el debido cuidado. Su proposición es que si el demandante miró y escuchó, y pudo haber visto y oído, y no vió u oyó, él no miró y escuchó como una cuestión de derecho. Esto sin embargo es una cuestión de hecho y no una cuestión de ley. Por mirar y escuchar el ju-

rado pudo haber entendido, bajo los términos de la instrucción, mirar y escuchar con la debida atención. El silogismo del demandado es algo parecido a esto: aunque tres y cuatro son siete, sin embargo, si suman ocho, no son tres más cuatro. Ciertamente, pero la cuestión de hecho es si hubo tres más cuatro y esto determina si la suma es siete o no. El demandado está moviéndose en un círculo. Si el demandante miró y escuchó, él vió u oyó el tren que se aproximaba; si pudo haberlo hecho, y si no vió y oyó aun cuando pudo haberlo hecho, entonces él no miró y escuchó con la debida atención.''

La cuestión planteada por el demandado en el caso de North Carolina tiene mucha analogía con el silogismo de que se vale para formular sus conclusiones la Corte de Distrito de Humacao. Aunque no lo dice la opinión de la corte, es de asumirse que en el caso de North Carolina el demandado ofreció su instrucción, teniendo en cuenta la prueba practicada. En nuestro caso la corte habla del silencio de la noche, la situación de la vía y el ruido de la máquina, al formular sus conclusiones. En cuanto al silencio de la noche, la corte inferior nos dice en su opinión que el accidente ocurrió durante las horas de la madrugada, tiempo en que el silencio es completo y absoluto, y mucho más en el campo donde no existe movimiento alguno. ¿Cómo pudo la corte inferior llegar a la conclusión de que el silencio fué completo y absoluto la noche que ocurrió el accidente? No se presentó prueba alguna acerca de las condiciones del tiempo en la mencionada noche. Hay ausencia completa de prueba con respecto al silencio o la quietud de la hora, no sabemos si había brisa o si reinaba absoluto reposo o en qué dirección soplaba el viento. No acertamos a comprender cómo pueden sentarse afirmaciones categóricas con respecto al silencio que reinara cuando ocurrió el accidente, sin el más leve átomo de prueba acerca de las condiciones atmosféricas en dicha noche, sobre todo en una zona tropical como la nuestra donde es de conocimiento común que la brisa sopla frecuentemente durante las horas de la noche. La ausencia de esta prueba no autoriza la presunción de un silencio completo y absoluto. Tampoco toma la corte conocimiento judicial de las condi-

ciones atmosféricas que son inestables y que pueden variar y varían frecuentemente.

En el caso de *City of Santa Cruz* v. *Enright,* 30 Pac. 197, dice la Corte Suprema de California:

"No podemos decir que la corte cometiera error al no admitir la declaración del testigo Ray en favor del demandado. A este testigo se le pidió que expresara su opinión como perito respecto al efecto del regadío en los terrenos pertenecientes al demandado. El letrado del demandante se opuso a la pregunta fundándose en que no se había demostrado que el testigo estuviera capacitado para declarar como perito. Se vió que la experiencia del testigo se limitaba al Condado de Santa Clara y que nunca había estado en los terrenos pertenecientes al demandado a no ser durante un día en el invierno anterior al día del juicio. Para que el testigo estuviese capacitado para declarar como tal debió haberse demostrado que las condiciones del clima, suelo, topografía y lluvia eran iguales en las montañas de Santa Cruz que en la parte sur del Condado de Santa Clara donde residía el testigo. La corte no puede tomar conocimiento judicial de tales cosas."

En el caso de *Haines* v. *Gibson,* 73 N. W. 197, la Corte Suprema de Michigan se expresa en los siguientes términos:

"El letrado también parece asumir que es de conocimiento ordinario que los lagos y arroyos de dicha sección están generalmente helados para el primero de abril, y aparentemente sostiene que por esta razón la interpretación más apropiada que debe dársele al contrato es que la madera debía ser transportada al Lago Pine y dejada en sus márgenes. La transportación al lago Ives es considerablemente más corta que la transportación desde el Lago Mountain al Lago Pine. El contrato no especificaba la ruta por la cual debía hacerse la transportación y evidentemente podía utilizarse cualquier ruta factible. Si los fiadores deseaban que se fijara una ruta, debieron haberlo especificado en el contrato. El letrado de los demandados trató de demostrar que Gibson & Gamble informó a sus fiadores que la transportación se haría por el Lago Mountain, mas los demandantes no estaban presentes y no se trató de probar que los demandantes tuvieron conocimiento de esta aseveración o que asintieran a ella. El contrato asume razonablemente la posibilidad de que las aguas estuvieran abiertas al tránsito de tal suerte que las maderas pudieran ser transportadas para el primero de abril. No podemos tomar conocimiento judicial de que las condiciones climatológicas en esa parte del estado

sean siempre tales que las aguas para esa época nunca permitan la transportación y de ahí interpretar este contrato en el sentido de que la madera debía ser transportada y dejada sobre el hielo en el Lago Pine. Creemos que la corte no cometió error al negarse a admitir prueba tendente a demostrar que la madera fué transportada al Lago Ives con el consentimiento de los demandados."

En el caso de *Dixon* v. *Nicholls,* 89 Am. Dec. 317, la Corte Suprema de Illinois dice que las cortes toman conocimiento judicial de hechos invariables, mas no de las vicisitudes del clima o de las estaciones. De la opinión de la corte en este caso copiamos lo siguiente:

"El demandado sostiene que como de conformidad con el contrato Brodrick debía entregarle los cereales tan pronto fuesen trillados y que como no se especificaba la fecha en que éstos debían serlo, de acuerdo con la ley debían ser trillados y entregados dentro de un tiempo razonable; e insiste además en que la corte toma conocimiento judicial de la época en que tales cosechas maduran, fundándose en el principio de que la corte tomará conocimiento judicial de todo aquello que sea generalmente conocido dentro de los límites de su jurisdicción. No creemos que la doctrina de conocimiento judicial haya sido llevada hasta el extremo que sostiene el demandado. No puede extenderse tanto, toda vez que la época en que maduran el trigo, la avena y la cebada varía grandemente en las distintas divisiones judiciales de este estado. En el Condado en que se vió este caso la época en que maduran estas cosechas es muy distinta a la del Condado en que se escribe esta opinión. Aun en la misma localidad existe diferencia. Las cortes deben tomar conocimiento judicial de hechos invariables, mas no de las vicisitudes del clima o de las estaciones. Estos hechos, al igual que otros, deben ser probados por la persona que trata de beneficiarse de ellos, si confía en la importancia de los mismos."

El viento puede dificultar que se oiga el ruido de una locomotora que se aproxima. En el caso de *Continental Improvement Co.* v. *Stead,* 95 U. S. 161, dice la Corte Suprema de los Estados Unidos:

"La velocidad de un tren en un cruce no debe ser tan grande que haga ineficaz el aviso del pito y de la campana, y esta precaución es especialmente aplicable cuando su sonido es interrumpido por

vientos y otros ruidos y cuando hay objetos que se interpongan y eviten a los que se acercan a la vía ver el tren que se aproxima. En tales casos, si se desea no reducir la velocidad, deben estacionarse celadores en el paso a nivel.''

La corte, en ausencia de prueba, no está autorizada para asumir un silencio completo y absoluto durante las horas de la noche. El juzgador debe ajustarse a la prueba practicada, sin penetrar en el campo de las conjeturas y especulaciones mentales. Con la misma razón que la corte inferior asume, en ausencia de prueba, que hubo silencio completo y absoluto, pudiera asumirse también que no lo hubo. Habla la corte inferior del ruido de una máquina que arrastra treinta vagones de caña, y tiene en cuenta este hecho para considerar inexplicable que el demandante no se diera cuenta durante las horas de la noche de que el tren se encontraba cerca. No nos convence la apreciación de la corte inferior. Tanto el derecho común como los estatutos de los varios estados requieren, cuando menos, un aviso razonable de la aproximación del tren a las personas que puedan atravesar la vía en los cruces de caminos públicos o calles. La ley no requiere cosas inútiles. Si el ruido de una locomotora fuese bastante para constituir suficiente aviso no existirían estas leyes ni se aplicarían estos principios por los tribunales de justicia. En los estatutos de los varios estados generalmente se exige toque de pito o campana, o ambas cosas. La ley de Puerto Rico impone a las compañías de ferrocarriles el deber de instalar en sus locomotoras campanas o silbatos que deberán usarse al acercarse a curvas, túneles, cruces de caminos públicos o calles. El número de vagones que pueda arrastrar una locomotora no se ha tenido en cuenta al exigirse estos requisitos ni en Puerto Rico ni en ninguno de los estados de la Unión.

La parte demandada nos dice en su alegato que el juez sentenciador tuvo conocimiento judicial de que un tren de treinta vagones hace ruido, que una locomotora conduciendo vagones de carga hace explosiones al expulsar el humo, que

tales explosiones son más fuertes cuando lleva mucha carga, que de la chimenea de la locomotora salen chispas y que salen más chispas cuando la locomotora está subiendo una pendiente o está haciendo mucha fuerza, y que en la oscuridad de la noche se nota una luminosidad en el humo que sale de la chimenea de la locomotora. Cita el abogado de la parte demandada en apoyo de su contención los casos de *Cleveland etc. R. Co.* v. *Nichols,* 99 N. E. 497; *Louisville etc. R. Co.* v. *Commonwealth,* 166 S. W. 237; *Moore* v. *Saginaw R. Co.,* 72 N. W. 1112; *Louisville etc. R. Co.* v. *Davis,* 75 So. 977; y *White* v. *N. Y. Cent. R. Co.,* 85 N. Y. Supp. 497.

Es claro que es una cuestión de conocimiento general que la máquina de una locomotora hace ruido y que tiene que hacerlo una locomotora que arrastra treinta vagones de carga. La cuestión estriba en determinar si este ruido constituye un aviso razonable a las personas que atraviesan un paso a nivel en un camino público o en una calle. No negamos la posibilidad de casos excepcionales en que el ruido del tren exceda los límites de lo ordinario y en que intervengan otras circunstancias que puedan apreciarse para determinar si hubo o no negligencia contribuyente; pero en estos casos, por lo mismo que se salen de lo ordinario, debe producirse prueba para que de ella surjan las inferencias y deducciones y no descansen en meras conjeturas o en el conocimiento que tenga la corte de que un tren hace ruido.

En el caso de *Dudley* v. *Wabash R. Co.,* 150 S. W. 737, dice la Corte de Apelaciones de Missouri:

"Sin embargo, la demandada también sostiene, en efecto, que el ruido y estruendo del tren eran suficientes para avisar al demandante de que no debía penetrar en la vía, y que el dejar de cumplir con tal aviso como cuestión de derecho equivalía a negligencia contribuyente. Hubo prueba, que en modo alguno es concluyente, de la cual tal vez podría inferirse que el tren hizo un ruido, distinto a los avisos estatutarios; en realidad, podría suceder, como sugiere la demandada, que las cortes tomen conocimiento judicial de que los trenes hacen ruido mientras corren, y el jurado quizá pudo haber inferido que en las circunstancias en que se colocó al demandante éste era

culpable de negligencia contribuyente al no oír y prestar atención a tal ruido. Empero, si el tribunal toma conocimiento judicial de que el tren produce ruido y fundado en ese mero hecho, asumido sin necesidad de. prueba, declara al demandante culpable de negligencia contribuyente, o le obliga a exonerarse afirmativamente, ¿qué ocurriría en estos casos de pasos a nivel con la regla de que la prueba del accidente y de no haberse dado las señales estatutarias constituyen un caso prima facie y hacen que el peso de probar la no responsabilidad recaiga en el demandado? Weigman v. Railroad (223 Mo. 699, 123 S.W. 38); McNulty v. Railroad, 203 Mo. 475, 101 S.W. 1082. Indudablemente que esta regla quedaría destruída. Como dicha regla ha sido establecida. por estatuto, conforme ha sido interpretado y sostenido por nuestra Corte Suprema, no es nuestra misión destruirla, sino mantenerla y seguirla. De ahí se deduce, pues, que debe aparecer no sólo que el tren produjo ruido (es impertinente que ello se haga mediante prueba o por conocimiento judicial), sino que las circunstancias no fueron tales que impidieran al demandante de oírlo o que le excusasen de no haberlo oído, y el peso de probar tales circunstancias recae sobre el demandado, y la cuestión era una a decidir por el jurado. En el presente caso no hubo una demostración tan concluyente que nos justifique en alterar el veredicto del jurado a este respecto; realmente estamos bajo la impresión de que durante el juicio la demandada no descansó en la defensa de 'otros ruidos', o de que de hacerlo así tan sólo fué ligeramente.''

La corte inferior, basándose en un hecho de conocimiento común, independientemente de la prueba practicada, hace deducciones e inferencias de carácter legal, que pueden ser discutidas, aceptadas o desaprobadas en apelación. Nosotros no encontramos razón alguna especial que justifique la conclusión de que el demandante, por el ruido de la locomotora y los vagones que arrastraba, tuvo necesariamente que darse cuenta de la aproximación del tren.

En el caso de *Cleveland etc. R. Co.* v. *Nichols, supra,* citado por la parte apelada, la compañía demandada alegó que la corte tuvo conocimiento judicial del ruido que hace un tren que camina a sesenta millas por hora. La Corte de Apelaciones de Indiana, resolviendo este punto dijo:

''Esta corte puede tomar conocimiento judicial del hecho de que un tren que se aproxima hace algún ruido, pero en los hechos alegados

nosotros no podemos ir al extremo de sostener como una cuestión de derecho que el aviso dado por dicho ruido fué suficiente para demos-trar que el interfecto fuera culpable de negligencia contribuyente.''

En el caso de *Louisville etc. R. Co.* v. *Commonwealth, supra,* citado también por la apelada, se acusaba a una compañía ferroviaria de mantener un estorbo público. El Gran Jurado formuló acusación contra esta compañía, y se presentó por ésta una excepción a la acusación que fué desestimada. La Corte de Apelaciones de Kentucky dijo en este caso:

''Es una cuestión de conocimiento común que la emisión de humo de una máquina y el toque de campana y pito y el crujir de las ruedas son necesarios incidentes a la operación de los ferrocarriles. Un ferrocarril no puede ser operado sin quemar carbón y el carbón no puede ser quemado sin expeler humo; toque de campana y pito no solamente son necesarios incidentes de la operación de un ferrocarril, sino que la ley requiere en muchas ocasiones que se den señales, y es perfectamente aparente que el crujir de las ruedas no puede ser evitado en la operación de los trenes.''

En el caso de *Moore* v. *Saginaw R. Co., supra,* el cual figura también entre los casos citados por la apelada, la Corte Suprema de Michigan se limita a decir que puede ''tomar conocimiento judicial de que es difícil, si no imposible, manipular trenes de diversas longitudes y pesos sobre rieles de distintos rasantes sin que haya concusiones.''

En el caso de *Louisville etc. R. Co.* v. *Davis, supra,* también citado por la apelada, se trataba de un incendio ocasionado por chispas de una locomotora, que destruyó la casa del demandante. Refiriéndose a las chispas que lanza la máquina de una locomotora, dijo la Corte Suprema de Alabama:

''Uno de los testigos del demandante declaró que las chispas fueron desacostumbradas en tamaño y cantidad, y otro declaró que fueron en cantidades mayores que las observadas por él en otras máquinas funcionando durante la noche. Desacostumbrada (*unusual*) es una palabra de comparación. Las comparaciones carecen evidentemente de valor probatorio a menos que las condiciones relativas sean substancialmente las mismas. La evidencia en este caso demues-

tra, y esto es de conocimiento general, que la cantidad de chispas emitida por una máquina depende de la fuerza y rapidez del escape, el que a su vez depende de la carga transportada y de la rasante y curvas de la vía. Evidentemente, la cantidad y tamaño de las chispas emitidas por una máquina bien cargada, mientras sube una pendiente, serán desacostumbrados comparados con los de una máquina con carga más liviana que discurra por una vía que esté a nivel o que baje una pendiente; más quizá no sean desacostumbrados comparados con las lanzadas por una máquina que funcione en condiciones igualmente desfavorables."

La emisión de humo y las chispas que lanza una máquina nada tienen que ver con el ruido de la misma. Suponemos que la demandada cita estas autoridades con el propósito de demostrar que el humo y las chispas constituyen elementos a considerar para hacer visible el tren que se aproxima.

Cita también la demandada el caso de *White* v. *N. Y. Cent. R. Co., supra,* que no hemos podido estudiar porque no se encuentra en nuestra biblioteca.

En cuanto a la situación de la vía, la corte nos dice en su opinión que corre casi paralela a la carretera, algunos metros antes de cruzar dicha carretera, y el abogado de la parte demandante en su alegato, primero, y en la vista del caso después, llamó la atención de esta corte acerca de esta afirmación, que según dicho abogado es inexacta y que no está justificada por la prueba. La corte inferior practicó una inspección ocular, cuyo resultado aparece descrito en la página 35 de la exposición del caso del modo siguiente:

"Se hizo constar en dicha inspección ocular que la vía cruza la carretera que de Humacao va a la playa en el sitio conocido por paso a nivel de la Central Pasto Viejo; que la vía cruza allí de norte a sur; que hacia el sur hay una pequeña curva y al norte existe una pequeña pendiente; que al oeste existe un número de casas a una distancia de la carretera y del sitio del cruce, como seiscientos o setecientos metros; que existe una alcantarilla, a seis metros más o menos hacia el este."

La parte demandada hace hincapié en esta inspección ocular y dice que en Puerto Rico no existe ley alguna con

respecto a inspecciones oculares y que puesto que la ley de evidencia viene de fuentes americanas es aplicable la jurisprudencia americana.

Sin admitir la bondad de la contención del ilustrado abogado de la parte demandada, entendemos que cuando un juez practica una inspección ocular y hace constar el resultado de dicha inspección y más tarde autoriza con su firma en la exposición del caso una descripción del sitio inspeccionado, ese juez no debe omitir ningún hecho esencial ni debe utilizar, para basar su fallo, ningún hecho que no haya sido incluído en dicha descripción.

El artículo 1194 de nuestro Código Civil, edición de 1930, equivalente al 1240 del Código Civil Español, dice que la prueba de la inspección personal del tribunal o juez sólo será eficaz en cuanto claramente permita al tribunal apreciar, por las exterioridades de la cosa inspeccionada, el hecho que trate de averiguar. Los precedentes de esta legislación se encuentran en las leyes de Partidas, especialmente la octava y la décimatercera del título 14 de la partida tercera. Esta prueba se llama reconocimiento judicial en la ley de enjuiciamiento civil española o inspección personal del juez en el Código Civil.

En cuanto a la forma de practicar la diligencia, entendemos que debemos atenernos a los principios de la antigua ley de enjuiciamiento civil, según la cual, decretado el reconocimiento judicial, el juez señalará para llevarlo a efecto, con tres días de anticipación por lo menos, el día y la hora en que haya de practicarse, pudiendo concurrir las partes, sus representantes y letrados a la diligencia del reconocimiento y hacer al juez de palabra las observaciones que estimen oportunas, permitiéndose también a cada parte ir acompañada de una persona práctica en el terreno, a quien el juez oirá si lo estima conveniente, previo juramento de decir verdad, y extendiéndose en todo caso acta del resultado de la diligencia, que firmarán los concurrentes y en la que se consig

narán las observaciones pertinentes hechas por una y otra parte y las declaraciones de los peritos.

Decimos que en cuanto a la forma de practicar la diligencia rige la antigua ley de enjuiciamiento civil, porque ni la orden general No. 118, que no menciona la inspección ocular, ni el Código de Enjuiciamiento Civil vigente, que tampoco la menciona, han derogado las disposiciones vigentes sobre esta prueba cuando estas últimas leyes de procedimientos fueron aprobadas. El Código de Enjuiciamiento Civil derogó toda ley, reales decretos, órdenes, órdenes militares, disposiciones o parte de ellas incompatibles o en conflicto con dicho código. La antigua ley de enjuiciamiento civil sobre reconocimiento judicial no puede estar en conflicto alguno con el Código de Enjuiciamiento Civil vigente que no menciona en absoluto esta clase de prueba.

No sabemos si en el presente caso se levantó un acta firmada por todos los concurrentes, pero sí sabemos que se hizo constar el resultado de la inspección ocular, que en la exposición del caso aparece una descripción del sitio, y que esta exposición fué autorizada por la corte con el consentimiento de las partes.

██ La corte inferior dice que se ha demostrado por la prueba que el demandante conocía perfectamente bien la carretera, constándole además que en aquel sitio no existían barreras ni cadenas, etc., para la protección de los transeuntes. Hemos examinado cuidadosamente toda la evidencia aportada durante el juicio y no hay en ella base suficiente para establecer afirmaciones tan categóricas. El demandante dijo que conocía a Pedro Vasallo, a quien había llevado varias veces a Naguabo. Esta es la única prueba, porque no existe otra en los autos, que ha podido tomar en consideración la corte inferior para hacer sus deducciones y sostener que el demandante conocía perfectamente todos estos detalles. Copiamos a continuación las afirmaciones categóricas de la corte, sugeridas indudablemente por las manifestaciones del demandante:

"Además se ha demostrado también por la prueba que el *chauffeur* que conducía el automóvil en cuestión conocía perfectamente bien la carretera de Humacao a la playa, y a más que le constaba que en aquel sitio no existían barreras ni cadenas para la protección de los transeúntes, así como también que no había persona o guardabarreras encargado de dar aviso a los viandantes de la proximidad del tren.''

La prueba de la demandada demuestra que por la noche no había allí persona alguna para hacer señales, pero que por el día sí. ¿En qué se basa la corte inferior para afirmar que al demandante le constaba que en el cruce no había persona o guardabarreras encargado de dar aviso a los viandantes de la proximidad del tren? ¿Dónde aparece la prueba que pueda justificar esta conclusión? Asumiendo que el demandante, al llevar a Pedro Vasallo en anteriores ocasiones a Naguabo, utilizó esa carretera y sabía que no había en el cruce barreras ni cadenas, no se probó que pasara por ese sitio durante la noche, y si lo hizo durante el día y vió allí una persona encargada de dar aviso, no estaba obligado a presumir que esta persona no estuviese allí por la noche. Nos parece que es éste un error manifiesto en la apreciación de la prueba por parte de la corte inferior.

Es verdad que Pedro Vasallo declaró que conocía el cruce, pero no se demostró que trasmitiera este conocimiento al demandante, y en ausencia de prueba no cabe atribuir a dicho demandante el conocimiento que del cruce tuviera su acompañante.

██ Alega la parte demandada que si esta corte estimó que el juez sentenciador había dejado de resolver hechos necesarios para fundar la sentencia apelada, procedía la revocación de la sentencia y un nuevo juicio. Alega además la demandada que el juez sentenciador resolvió que el demandante no paró ni escuchó antes de cruzar la vía, y que si se hubiera parado y escuchado se habría enterado de la aproximación del tren.

La corte inferior no ha dicho que dejara de creer al demandante y a su testigo Pedro ·Vasallo, basándose en su manera de declarar o en cualquier otra razón que pudiese poner en tela de juicio la veracidad de dichos testigos. La corte *a quo* considera al demandante negligente si se tocó pito y campana, y luego, teniendo en cuenta única y exclusivamente el silencio completo y absoluto de la noche, la situación de la vía y el ruido de la locomotora, encuentra inexplicable que el demandante ·no se diera cuenta de la aproximación del tren. Esta corte no está obligada a aceptar inferencias y deducciones de las cortes inferiores en el análisis de la prueba, ni está tampoco obligada a aceptar hechos que no surgen de · la prueba y de los cuales no se toma conocimiento judicial.

Si la afirmación de que el demandante paró, miró y trató de oír, y no vió ni oyó, no resulta físicamente increíble, entendemos que este testimonio debe ser apreciado y considerado de acuerdo con las reglas de evidencia. No debemos olvidarnos de que no hay conflicto de prueba sobre este extremo, que se trata de manifestaciones que no han sido contradichas, y que la corte inferior, si en realidad no creyó a estos testigos, basa su conclusión en considerar inexplicable que el demandante no se diera cuenta de que el tren se aproximaba.

Sin parar mientes en la declaración del demandante, por el natural interés que ha de tener en su propia causa, vamos a atenernos a la declaración no contradicha de Pedro Vasallo, quien declara que el demandante, poco antes de llegar al cruce, paró el ''Ford'' y miró a un lado y otro de la vía, y no vió venir ninguna locomotora.

En el caso *In re Miller's Will*, 49 Ore. 452, 90 Pac. 1002, dice la Corte Suprema de Oregon:

''Ha sido firmemente establecido como una regla general que cuando un testigo desinteresado, que no ha sido desacreditado por otra evidencia, testifica sobre un hecho dentro de su conocimiento que no es por su naturaleza improbable o en conflicto con otra evidencia,

el testigo debe ser creído y los hechos así presentados deben ser considerados como legalmente establecidos.''

La regla general es que el testimonio positivo de un testigo desinteresado que no ha sido impugnado ni contradicho no puede ser arbitraria o caprichosamente descartado.

Veamos si la declaración de Pedro Vasallo de que el demandante miró a un lado y otro de la vía y no vió ninguna locomotora resulta increíble o improbable. El maquinista de la demandada, Rafael García, nos dice que a la máquina se le perdieron los reflectores y que cuando ocurrió el accidente tenía dos faroles de gas, dos farolitos de gas pequeños. Es innecesario citar jurisprudencia para demostrar que estas luces son insuficientes para hacer visible un tren a una distancia razonable. La corte inferior nos dice en su opinión que el sitio entre la carretera y la vía se encuentra sembrado de cañas, no pudiéndose determinar la altura a que alcanzaban estas cañas en la noche del accidente. Es verdad que no se fijó la altura de las cañas según dice la corte inferior; pero el testigo Pedro Vasallo declaró, sin que su testimonio aparezca contradicho, que en esa época había cañas a ambos lados de la vía y no se podía ver. Si se tiene en cuenta que la locomotora únicamente llevaba dos faroles de gas pequeños, según resulta de la propia prueba de la demandada, y que había cañas a un lado y otro de la vía que impedían ver, no parece irrazonable la declaración del testigo de que a pesar de haber mirado, el demandante no vió venir ninguna locomotora.

Con respecto a las luces que debe llevar un tren, dice Thompson en sus ''Commentaries on the Law of Negligence'', párrafo 1548, página 224:

''*Ausencia de luces adecuadas en la parte delantera de las locomotoras y trenes.*—El deber que la ley impone a todo viandante que se acerca a un paso a nivel de estar a la espectativa de los trenes que se avecinan, sería ilusorio si tales trenes no llevaran luces por las cuales su proximidad pudiera ser discernida durante la noche. Por tanto, se ha dicho muy bien que existe un deber recíproco entre

los que se acercan a un paso a nivel durante la noche, de estar a la expectativa de los trenes que se avecinan y la compañía ferroviaria de tener focos en la parte delantera de sus locomotoras, de tal suerte que la mirada de los caminantes sea eficaz y le dé el correspondiente aviso. Se ha calificado muy bien de negligencia, como cuestión de derecho, el que una compañía ferroviaria corra un tren de pasajeros en una noche obscura, en un distrito densamente habitado, al llegar a un paso a nivel cerca de los suburbios de la ciudad a razón de veinticinco millas por hora sin tener encendida la luz de la parte delantera de la locomotora. Con frecuencia se han aprobado ordenanzas municipales que imponen a los trenes en movimiento el deber de tener luces encendidas durante la noche, y cuya infracción será considerada como negligencia *per se* o como prueba prima facie de negligencia, de acuerdo con la teoría prevaleciente en la jurisdicción de que se trate. Si además de no tener luces delanteras el tren se acerca al paso a nivel a una velocidad peligrosa y sin dar aviso alguno, la negligencia de la compañía ferroviaria, de conformidad con la teoría de una corte, es tan crasa, que hace que la compañía sea responsable, no obstante la negligencia contribuyente del conductor del carro que cruza la vía, al dejar de *detenerse, mirar* y *oír*. Se ha resuelto que constituye negligencia el hecho de dar contramarcha a un tren que viene con varias horas de retraso, en una noche obscura, en un tinglado que se utiliza como estación, a través de una vereda muy usada por el público con conocimiento y consentimiento de la compañía, sin llevar luces, sin tener guardavía o guardaaguja en la parte anterior del carro delantero, en caso de que el tren así conducido lesione a una persona que esté en dicha vereda. En casi todos los casos que tratan de esta clase de negligencia, la ausencia de luces en la locomotora o en los vagones durante la noche está asociada con alguna otra falta, tal como el correr la locomotora o los vagones a una velocidad excesiva o prohibida y sin dar avisos que puedan ser oídos por los viandantes oportunamente de tal suerte que puedan salirse de la vía.''

La demandada cita cuatro casos para apoyar su afirmación de que la corte inferior resolvió que el demandante no se paró ni escuchó y que de la falta de tomar tal precaución resultó el accidente.

De estos casos el que aplica con mayor rigurosidad la doctrina de la negligencia contribuyente es el caso de *Atlantic Coast Line R. Co.* v. *McLeod,* 11 Fed. (2d) 22, resuelto por

la Corte de Circuito de Apelaciones del Cuarto Circuito. En este caso el accidente ocurrió en el condado de Sumter, Carolina del Sur, durante las horas de la noche. Se probó que la locomotora estaba equipada con un foco eléctrico encendido y en buenas condiciones y que el tren había sido oído por uno de los testigos del demandante a una distancia de doscientas cincuenta yardas. El demandante declaró que poco después de la media noche él y dos jóvenes iban por el camino público y que se encontraban en el acto de cruzar la vía cuando fueron arrollados por el tren de carga que se aproximaba, con el resultado de que los jóvenes fueron inmediatamente muertos. Esta fué la declaración del demandante durante el juicio. Poco después del accidente el demandante manifestó al coronel del Condado de Sumter y también al médico que lo asistió que él y sus compañeros habían estado bebiendo la noche de la ocurrencia y que los tres se habían ido a dormir a la vía; que el tren lo despertó y estaba en actitud de levantarse cuando fué arrollado por el mismo. El demandante declaró que miró y escuchó al aproximarse el tren. La corte se basa en el testimonio del propio demandante para concluir que él se adelantó directamente al frente del tren que se aproximaba, cuando pudo, por el ejercicio del menor cuidado, haber visto el peligro y evitado el daño. ''Este,'' dice la corte, ''no es el caso de un viajero en un automóvil cuya atención está ocupada en parte en el manejo de su propio carro y que no puede parar instantáneamente a causa de su impulso. Este es el caso de una persona a pie que camina libremente por un camino público sin otra cosa que hacer que mirar y escuchar mientras se aproxima al cruce, que está en libertad constantemente, mientras se acerca a la vía, de parar y evitar el peligro, y que sin embargo, con sus ojos abiertos y su cerebro claro, camina deliberadamente enfrente de un tren de cuarenta y cinco vagones que desarrollaba una velocidad de treinta millas por hora y que hacía tanto ruido que fué oído a una distancia de doscientas cincuenta yardas.'' La corte considera increíble el testimonio del demandante de que miró y

escuchó al aproximarse al cruce. "Si miró y escuchó," dice la corte, "inmediatamente antes de penetrar en la vía, él debió haber visto y oído el tren, y nosotros resolvemos que si en realidad miró y escuchó cuando se aproximaba al cruce, debió haberlo hecho a alguna distancia y no inmediatamente antes de entrar en la vía."

Los hechos desarrollados en el caso resuelto por dicha Corte de Circuito de Apelaciones para el Cuarto Circuito son distintos a los hechos del caso que tenemos ante nos. En primer lugar, las inferencias y deducciones de la corte, que se nos antojan algo severas, están basadas en la prueba. Se probó que la locomotora estaba equipada con un foco eléctrico encendido y en buenas condiciones. En nuestro caso sólo se probó que la locomotora llevaba dos faroles de gas pequeños. Se probó, por la propia prueba del demandante, que el tren había sido oído a una distancia de 250 yardas. En nuestro caso no hay prueba alguna que contradiga el testimonio de que el demandante no oyó el tren. La misma corte se encarga de establecer la diferencia entre una persona que cruza la vía a pie y una que la cruza manejando un automóvil. Y la misma corte dice, aunque esto parece inexplicable, que el demandante, con sus ojos abiertos y su cerebro claro, deliberadamente caminó enfrente del tren que se aproximaba. El instinto de propia conservación parece rechazar estas conclusiones, a menos que el demandante hubiese estado bebiendo, como dijo a raíz del accidente, y se encontrase ebrio, en cuyo caso no podía tener su cerebro claro y sus ojos normalmente abiertos, aunque fuese culpable de negligencia contribuyente. Si a esto se añade que los dos jóvenes que acompañaban al demandante perecieron en el accidente, tendríamos que considerar a estas tres personas más bien culpables de un acto de locura que de imprudencia temeraria, porque no de otro modo se concibe que caminaran deliberadamente, con exposición de sus vidas, frente al tren que se aproximaba.

A propósito de esta natural inclinación a protegernos contra el peligro, dice la Corte Suprema de los Estados

Unidos en el caso de *Baltimore & Potomac R. R.* v. *Landrigan,* 191 U. S. 461:

". . . La presunción se basa en una ley de la naturaleza. No sabemos de ningún instinto más universal que el de la propia conservación—de ninguno que obligue a uno tan insistentemente a cuidarse a sí mismo de cualquier lesión. Su ejercicio está basado en el temor al dolor, la mutilación o la muerte. Hay muy pocas presunciones basadas en los sentimientos y experiencia humanos, que tengan base más firme que la expresada en la instrucción objetada. Mas a pesar de los incentivos que existan en contrario, los hombres a veces son distraídos, descuidados o imprudentes ante el peligro. Esto la ley no lo excusa, ni hace distinción entre los grados de negligencia."

En este caso se trataba de una persona que perdió la vida en un accidente ferroviario y la Corte Suprema se extiende en estas consideraciones comentando y aprobando una instrucción al jurado, en la cual se decía que en ausencia de prueba en contrario debía presumirse que la víctima del accidente paró, miró y escuchó.

En el caso de *Gordon Fireproof Warehouse and Van. Co.* v. *Hines,* 272 Fed. 604, citado por la demandada, se consideró también demostrada la negligencia contribuyente. Se trataba en este caso de una colisión ocurrida entre un autocamión guiado por un tal Kimball y un carro de carga que con tres carros más era impulsado a través de la calle por una máquina de la empresa ferroviaria. Kimball, quien estaba familiarizado con el cruce, por donde pasaba tres o cuatro veces al día, declaró que como a cinco pies de la vía del oeste redujo la velocidad del autocamión a menos de ocho millas y que no podía precisar a cuánto redujo la velocidad, y que cuando vió venir el tren trató de cruzar la vía. Declaró además que al reducir la velocidad miró y no vió ni oyó que se aproximaran carros. La corte describe el sitio del accidente, examina la prueba, y teniendo en cuenta las circunstancias del caso, llega a la conclusión de que Kimball, si no miró para ver los carros que se aproximaban, incurrió en negligencia, y si miró, debió haber visto los carros que se

acercaban a la calle, y si habiendo visto, como dijo en su declaración, trató de cruzar la vía, sin lograr su objetivo, también fué culpable de negligencia. Se probó en este caso que el autocamión caminaba a quince millas por hora cuando ocurrió el accidente y que Kimball no paró para mirar y escuchar. Se alegó en la contestación que el accidente se debió únicamente a la negligencia y descuido de Kimball.

En el caso de *Southern Railway Co.* v. *Smith,* 86 Fed. 292, se probó, mediante testimonio no discutido, que el tren que se aproximaba pudo ser visto a una distancia de doscientas yardas o un cuarto de milla del sitio en que ocurrió el accidente. Todos los testigos, con excepción del demandante, declararon que vieron el tren que se aproximaba, y muchos que oyeron el toque de campana. El accidente ocurrió durante las horas del día. El demandante declaró en repetidas ocasiones que miró para ver si se aproximaba el tren. La corte consideró increíble el testimonio del demandante. El tren estaba a la vista, dicen, y el demandante o no miró o si miró estaba obligado a verlo.

En el caso de *May* v. *Rhode Island Company,* 176 Fed. 383, la Corte se expresó en los siguientes términos:

"Un número de testigos desinteresados y respetables declaró que cuando el demandante se dispuso a cruzar la vía el carro estaba tan cerca que una colisión fué inevitable. Conforme al testimonio positivo del motorista, inmediatamente trató de parar el carro, y su falta para evitar la colisión se debió no a carencia de esfuerzos o debida diligencia de su parte, sino a lo cerca del lugar en que el demandante intentó cruzar la vía.

"La única declaración tendente a demostrar que el demandante ejerció el menor cuidado es la del demandante mismo, quien declara que dobló a fin de cruzar detrás de un carro que se dirigía hacia el oeste y que la cabeza de su caballo estaba como a un pie de distancia de la vía cuando él miró hacia ésta en la dirección de donde venía el carro que chocó con él, a distancia considerable. Su aseveración de que él miró está controvertida directamente por las declaraciones de varios testigos y por el hecho de que si hubiese mirado hubiese visto el carro a poca distancia."

Hasta aquí los casos citados por la parte demandada.

Los hechos que sirven de base a las conclusiones formuladas en estos casos, aparte de que fueron establecidos por la prueba, no pueden compararse a los hechos asumidos por la Corte de Distrito de Humacao para luego derivar de los mismos sus inferencias y deducciones. En el caso de *Gordon Fireproof Warehouse & Van. Co.* v. *Hines, supra,* la víctima del accidente no paró el autocamión que caminaba a quince millas por hora cuando ocurrió el accidente, para mirar y escuchar, y además declaró que cuando vió venir el tren trató de cruzar la vía. En el caso de *Southern Railway Co.* v. *Smith, supra,* el accidente ocurrió durante el día y todos los testigos, incluyendo los del demandante, declararon que vieron venir el tren que se aproximaba, y muchos que oyeron el toque de campana. El demandante declaró que miró, en presencia de una prueba unánime de que se había visto el tren y de una prueba robusta de que se había oído. La corte consideró increíble su declaración. En el caso de *May* v. *Rhode Island Co., supra,* el mismo demandante declaró que dobló a fin de cruzar detrás de un carro que se dirigía hacia el oeste y que la cabeza de su caballo estaba como a un pie de la vía cuando miró en la dirección del carro que chocó con él. Las diferencias que existen entre estos casos y el nuestro son tan evidentes que consideramos innecesario tratar de ponerlas de relieve.

''No existe una regla fija en la ley'', dice el Juez Lamar en *Grand Trunk Railway* v. *Ives,* 144 U. S. 408, 417, ''por la cual una corte esté autorizada para decir arbitrariamente en cada caso qué conducta será considerada razonable y prudente y cuál constituirá cuidado ordinario bajo cualquiera y todas las circunstancias. Los términos 'cuidado ordinario', 'prudencia razonable' y otros semejantes, aplicados a la conducta de los asuntos humanos, tienen una relativa significación y no pueden ser arbitrariamente definidos. Lo que puede ser cuidado ordinario en un caso, puede, bajo diferentes circunstancias, constituir negligencia crasa.'' Y es que cada

caso tiene sus peculiaridades, sus rasgos característicos, su sello especial, su fisonomía propia, y no sería empresa fácil impartir justicia si para apreciar qué hechos constituyen cuidado ordinario o negligencia tuviésemos que ajustarnos a reglas fijas e invariables.

El hecho de que no se vea ni oiga a pesar de haberse mirado y tratado de oír no es necesariamente prueba de negligencia contribuyente como lo demuestran las decisiones que pasamos a citar. En el caso de *Baltimore & Ohio Railroad Co.* v. *Griffith,* 159 U. S. 603, se trataba de una colisión ocurrida entre un carro que guiaba la madre de la demandante y un tren de pasajeros de la demandada. "En este caso", dice la Corte Suprema de los Estados Unidos, "hubo evidencia de que no se tocó campana, y que se tocó pito, si es que se tocó, en el puente del ferrocarril, a una distancia de casi media milla del cruce." Se dió un veredicto en favor de la demandante y la Corte Suprema consideró justificado dicho veredicto, declarando que no se había dado suficiente aviso y que la colisión fué causada por la negligencia de las personas que tenían a su cargo el tren. En este mismo caso dijo la corte:

"Hubo evidencia tendente a demostrar que estas mujeres iban despacio y con un caballo seguro; que el tren iba con varios minutos de retraso; que a medida que ellas se aproximaban al sitio bajo en que podría verse un tren, en caso de que lo hubiere, se detuvieron para mirar y escuchar, pero ninguna de ellas vió ni oyó nada; que después de haberse detenido ellas prosiguieron su marcha pausadamente por la colina hasta un punto en lo alto, entre cuarenta y cincuenta yardas de la vía, donde empezaba la pendiente, y allí nuevamente se detuvieron, tratando de oír y nada oyeron; entonces ellas siguieron bajando la pendiente con lentitud, permaneciendo alerta todo el tiempo, sin hablar, y de nada se percataron; y que en el momento mismo en que llegaron al cruce y el caballo puso sus patas en el riel más cercano, salió el tren de la curva y ocurrió el choque.

"Toda vez que la ausencia de cualquier falta de parte de un demandante puede inferirse de las circunstancias, y tenerse en cuenta la disposición de las personas para guardarse del peligro y mantenerse fuera de dificultades, *Railroad Company v. Gladmen,* 15 Wall, 401,

es imposible resolver, a la luz de esta prueba, como cuestión de derecho que la conducta de la demandante fué tal que pueda servir de impedimento a la indemnización."

Hemos citado este caso para demostrar que la Corte Suprema de los Estados Unidos, al sostener la sentencia de la corte inferior y el veredicto del jurado, no consideró increíble que las personas que iban en el coche no vieran ni oyeran el tren que se aproximaba, a pesar de que, según su testimonio, miraron y trataron de oír en repetidas ocasiones antes de llegar y mientras se acercaban al cruce.

En el caso de *Keese* v. *N. Y. etc. R. Co.*, 67 Barb. 205, dice la Corte Suprema de Nueva York:

"La prueba del demandante estableció diligencia, observación y precaución adecuadas de parte del interfecto—el uso de ojos y oídos —antes de tratar de cruzar la vía de la demandada. La ley no requiere que la vista y los oídos del caminante sean inmaculados o infalibles, sino que los use para evitar ser lesionado—un incidente más susceptible de ocurrir que lo contrario. No ha de presumirse, a base de una consideración justa de las cosas de la vida, que un hombre hará uso de su vista y sus oídos para incurrir en peligro—para sólo simular y no actuar—sino que vencido por el instinto de la propia conservación él huirá del peligro, no lo buscará."

En el caso de *Wiedman* v. *Erie Railroad Co.*, 66 App. Div. 347, la corte se expresó en estos términos:

"Se ha resuelto (Henavie v. N. Y. C. and H. R. R. Co., 166 N. Y. 280) que una compañía ferroviaria que hace funcionar una locomotora rápidamente durante las horas de la noche por una carretera pública a través de un paso a nivel, sin ninguna otra señal de su aproximación que un foco delantero, puede ser declarada culpable de negligencia, y que no es de rigor declarar, como cuestión de derecho, que la persona que choca con ese tren es culpable de negligencia contribuyente, aunque viera tal foco delantero.

"Tampoco debe resolverse que el demandante especialmente bajo las sombras del crepúsculo o la obscuridad reinante al tiempo del accidente, fué culpable de negligencia contribuyente porque, a través de esta obstrucción, no vió la parte superior del tren de la demandada, asumiendo que pudiera haberla visto. Al demandante no debían exigírsele todas las posibilidades de visión y oído a medida que

se aproximaba a la vía. Él no estaba obligado a ver ni a precaver ningún resultado específico. Él simplemente estaba obligado a realizar el esfuerzo razonable de ver y tratar de oír que un hombre cuidadoso y prudente realizaría bajo parecidas circunstancias.''

En el caso de *Cherry* v. *Louisiana & Arkansas Railway Co.*, 12 La. 471, 126 Am. State Reports 323, se trataba de una colisión ocurrida entre un vagón de mulas guiado por un tal Mr. Johnson y una locomotora de la demandada. En el vagón iban Mr. Johnson, su hijo y dos nietos. El hijo resultó ileso, los nietos murieron al día siguiente del accidente y Johnson quedó sin sentido, aunque no seriamente lesionado. En este caso había un serio conflicto de prueba con respecto a la velocidad de la locomotora y al toque de pito y campana. El accidente ocurrió durante las horas del día. De la opinión emitida por la Corte Suprema de Louisiana en este caso copiamos lo siguiente:

''La dotación de la locomotora y un testigo que la vió por primera vez cuando ésta se hallaba a unos treinta pies del paso a nivel manifiestan que marchaba a una velocidad de seis a diez millas por hora; mas si con esto se quiere decir que no caminaba por el batey más aprisa de lo ordinario, este testimonio es contrario al de un gran número de testigos cuya atención ella atrajo. Estos testigos vivían cerca del batey y estaban avezados a los ruidos y movimientos que había en el mismo, y la velocidad de esta locomotora probablemente no hubiese atraído su atención si no hubiera sido inusitada; y el efecto producido a los vagones demuestra que el golpe tuvo que ser rápido. A las dos ruedas traseras se les rompieron todos los rayos. Un testigo con más de doce años de experiencia como maquinista de locomotoras declara que la rapidez con que funcionaba la válvula de escape atrajo su atención hacia la locomotora; que ésta cerró el vapor como a 275 yardas del paso a nivel y que él continuó observándola hasta que la máquina se hallaba a unas 75 yardas del cruce, y que ésta aun caminaba como a razón de veinticinco millas por hora. En vista de las declaraciones contradictorias es imposible saber definitivamente la distancia corrida por la locomotora después del choque.

''*      *      *      *      *      *      *

''Es inconcebible que si se hubiese tocado el pito a una distancia suficientemente cerca del cruce para que sirviera de aviso, o que si se hubiese tocado la campana continuamente, estas señales de aviso

no hubiesen sido oídas por Johnson y por todas las personas cuya atención fué atraída por la velocidad inusitada de la locomotora. La teoría que mejor armoniza este testimonio contradictorio es que el pito fué tocado demasiado lejos para que sirviera de aviso y que se empezó a tocar la campana demasiado cerca o demasiado tarde.

, "La parte demandada presenta un argumento muy elaborado y diagramas para demostrar que la chimenea de la locomotora sobresalía pie y medio por encima del largo tren cargado de madera al otro lado del cual se hallaba la locomotora y que Johnson pudo haberla visto. Pero la mejor prueba de que Johnson no pudo verla se halla en el hecho de que él se detuvo y miró y no la vió, a pesar de que tenía buena vista y estaba familiarizado con el paso a nivel.

"*       °       *       *       *       *       *       *

"Aquel que en una vía pública se acerca a la vía de un ferrocarril y no puede oír ni ver indicio alguno de un tren en marcha no es culpable de negligencia al presumir que no se halla ningún tren suficientemente cerca para que el cruce sea peligroso."

En el caso de *Hahn* v. *Chicago M. & St. P. Ry. Co.*, 47 N. W. 620, el jurado rindió un veredicto especial declarando probados los siguientes hechos: Que se tocó pito cuando la locomotora estaba en o cerca del sitio de alarma (*Whistling post*) hasta que la locomotora llegó al cruce donde ocurrió el accidente; que se tocó campana continuamente desde un punto en o cerca del sitio de alarma hasta que la máquina llegó al cruce donde ocurrió el accidente; que la locomotora desarrollaba una velocidad de cuarenta y cinco millas por hora desde el sitio de alarma o cerca de él hasta el sitio donde ocurrió el accidente; que el caballo que arrastraba el coche de la demandante caminaba a tres millas y media por hora desde una distancia de doscientos pies al sitio en que ocurrió el accidente; que a cien o doscientos pies del sitio en que ocurrió el accidente y al este del mismo, una máquina que se aproximara, caminando en la misma dirección de la demandante, podía ser vista desde la avenida Oakton a una distancia de 2,600 pies; que a veinte pies del sitio donde ocurrió el accidente y al este del mismo, una máquina que se aproximara, caminando en la misma dirección de la demandante, podía ser vista desde la avenida Oakton a una

distancia de ochocientos pies; que la demandada fué negligente y que la demandante no fué culpable de negligencia que contribuyera al accidente. La Corte Suprema de Wisconsin sostuvo la sentencia de la corte inferior y el veredicto del jurado. De la opinión emitida por dicha corte copiamos lo siguiente:

. . . "Tanto la demandante como su hermana, que estaba con ella en el carruaje, declararon que cuando se hallaban como a 200 pies del cruce (medidos a través del camino por el que iban), ambas miraron para la vía hacia el este y el oeste y ninguna de ellas vió y oyó tren alguno. También declaran que cuando cruzaron el primer apartadero, a poco más de 100 pies del cruce, volvieron a mirar y nada vieron y oyeron; que miraron y nada vieron cuando se hallaban entre los dos apartaderos, y que la primera vez que una de ellas vió u oyó el tren fué cuando se dió la alarma por la locomotora que se aproximaba, cerca del tanque de agua, como a cuatrocientos pies del cruce, cuando ya era demasiado tarde para precaver el daño. Otros testigos que las vieron aproximarse al cruce, cerca del primer apartadero, y que les pasaron en la carretera, dicen que ellas trataron de ver si venía el tren, y estos testigos no vieron u oyeron la locomotora que se aproximaba hasta que se tocó la campana cerca del tanque de agua. Otras personas del mismo vecindario que declararon dicen que no vieron u oyeron la locomotora que se acercaba hasta que se tocó el pito cerca del tanque. Es verdad que algunos otros testigos declararon que oyeron la campana y el pito cuando fueron tocados cerca del poste de alarma y durante todo el trayecto hasta el cruce, pero esta evidencia no establece con certeza el hecho de que la demandante o su hermana oyeron o pudieron haber oído el pito y la campana a medida que se aproximaban a la vía; puede tender a establecer ese hecho, pero no lo prueba como materia de ley—esa es una cuestión de hecho que queda para ser resuelta por el jurado."

Copiamos estas decisiones para demostrar cómo varía el criterio de los tribunales con respecto a esta facultad de ver y oír, y cómo en algunos casos se aplica un criterio severo y en otros un criterio más humano y liberal. En el caso que acabamos de citar una de las dos mujeres que iban en el coche declaró que oyó el toque de alarma cuando la locomotora estaba como a 400 pies de distancia del cruce, y que este

aviso fué demasiado tardío para que se pudiese evitar el accidente.

En *Continental Improvement Co.* v. *Stead,* 95 U. S. 161, 164, el cual es un caso de colisión entre un tren de pasajeros de la demandada y el vagón del demandante, el Juez Bradley, hablando a nombre de la corte, explica los mutuos deberes a que están obligadas tanto las compañías de ferrocarriles como las personas que cruzan la vía, del modo siguiente:

. . . . ''Si un ferrocarril atraviesa una carretera corriente al mismo nivel, los que caminan en el uno o por la otra tienen un derecho legal a pasar por el punto de cruce y a exigir el debido cuidado de parte de aquellos que transitan por el otro, a fin de evitar un accidente. Desde luego, estos derechos mutuos respetan otros derechos relativos que subsisten entre las partes. A causa de la naturaleza y el impulso de un ferrocarril y los requisitos del tránsito público por medio del mismo, no puede esperarse que se detendrá y dará paso preferente a un vehículo que se aproxima para que cruce primero: es deber del vehículo esperar que el tren cruce. El tren tiene la preferencia y el derecho de paso. Pero está obligado a dar adecuado aviso de su aproximación, de suerte que el vehículo pueda detenerse y dejarlo pasar, y a hacer uso de todos los medios disponibles para detenerse si el vehículo se halla inevitablemente en el trayecto. Ese aviso debe ser razonable y oportuno. Pero lo que constituye un aviso razonable y oportuno depende de muchas circunstancias. No puede serlo si la velocidad del tren es tan grande que lo haga inútil. La explosión de un cañón puede tenerse como un aviso del disparo que llega; pero la velocidad de éste generalmente sobrepuja al aviso. La velocidad de un tren en un cruce no debe ser tan grande que haga ineficaz el aviso del pito y de la campana, y esta precaución es especialmente aplicable cuando su sonido sea interrumpido por vientos y otros ruidos y cuando haya objetos que se interpongan y eviten a los que se acercan a la vía ver el tren que se aproxima. En tales casos, si se desea no reducir la velocidad, deben estacionarse celadores en el paso a nivel.

''Por otra parte, aquellos que cruzan la vía están obligados a ejercer ordinario cuidado y diligencia para cerciorarse de si se acerca un tren. Ellos tienen en verdad los mayores incentivos a la cautela, pues sus vidas están en inminente peligro si ocurre un choque; así pues, no se ha de presumir, en ausencia de prueba, que ellos no ejercen el debido cuidado en un caso en particular. Pero no obstante el

riesgo, la falta de firmeza de la mente humana en el hombre común es tal que él frecuentemente manifiesta un grado de negligencia y temeridad de todo punto incompatible con el cuidado y la prudencia que se le exige—que ejercería un hombre ordinariamente prudente bajo las circunstancias. Cuando tal es el caso, él no puede obtener resarcimiento por los daños que sufra aunque la compañía ferroviaria haya tenido alguna culpa. El ha labrado su propio infortunio. Estas proposiciones son tan indiscutibles que no es menester citar autoridades en su apoyo. Creemos que el Juez actuó con perfecto acierto, por tanto, al resolver que las obligaciones, derechos y deberes de los ferrocarriles y los caminantes por cruces son mutuos y recíprocos, y que no se exige un mayor grado de cuidado de los unos que de los otros. Porque admitiendo que el tren tiene el derecho preferente a cruzar, las partes, no obstante, están en iguales condiciones respecto al ejercicio de cuidado y diligencia en lo referente a sus deberes respectivos. El derecho de procedencia aludido no impone al vehículo todo el deber de evitar un choque. Lo acompaña. y le sirve de condición el deber del tren de dar debido y oportuno aviso de su aproximación. El deber del vehículo a dar preferencia se basa en esta condición. Ambas partes tienen el deber mutuo de permanecer avizores al peligro; y el grado de diligencia que cada parte ha de ejercer como persona prudente es el que una persona prudente ejercería bajo las circunstancias del caso al tratar buenamente de cumplir con su deber. La instrucción del juez substancialmente estuvo de acuerdo con estos puntos de vista.

"El error del abogado de la demandada consiste en tratar de imponer al vehículo con demasiada exclusividad el deber de impedir el choque, y a relevar al tren por completo de toda responsabilidad en el asunto. Las compañías de ferrocarril no pueden esperar esta inmunidad mientras sus vías crucen las carreteras del país al mismo nivel. El público tiene el mismo derecho a caminar por las carreteras ordinarias como lo tienen las compañías ferroviarias para explotar sus trenes por las vías."

Como ha dicho el tribunal Supremo de los Estados Unidos, las personas que cruzan la vía tienen los mayores incentivos para ser cautelosas, ya que sus vidas están en inminente peligro si ocurre un choque, y no debe presumirse, en ausencia de prueba, que no ejercieron el cuidado ordinario que debe esperarse de una persona prudente y cautelosa. En el presente caso se trata de un tren de carga. No hay prueba

de que el demandante tuviese noticias de que el tren había de cruzar el paso a nivel a la hora en que fué víctima del accidente. Este accidente ocurrió durante las horas de la noche, cuando no había en el cruce ninguna persona encargada de avisar la aproximación del tren. Nosotros, luego de haber estudiado y analizado las alegaciones y la prueba aportada, no creemos justificada la conclusión de que el demandante tuvo necesariamente que ver y oír, por lo menos en tiempo oportuno para evitar el accidente. Por otra parte, esta corte ha declarado en repetidas decisiones que la negligencia contribuyente es una defensa que incumbe alegar y probar al demandado. *Maldonado* v. *Hamilton,* 32 D.P.R. 224; *González* v. *Malgor, Luiña & Co.,* 29 D.P.R. 105; *Truyol Co.* v. *West India Oil Co.,* 26 D.P.R. 369; *Rosado* v. *Ponce Ry. & Light Co.,* 20 D.P.R. 564. Esta es la doctrina que prevalece generalmente en los estados que han adoptado el moderno sistema de procedimiento, a menos que la negligencia contribuyente surja de las alegaciones de la demanda o la prueba del demandante, en cuyo caso el demandado queda relevado de alegar y probar lo que ya ha sido demostrado por el propio demandante. Esto no ocurre en el presente caso. La demandada establece en su contestación como única defensa la alegación de que el demandante colocó maliciosamente el automóvil en la vía. Esta alegación, que no ha sido probada, no puede cubrir ningún otro acto de negligencia. La demandada no puede traspasar los límites que se trazara en su contestación, debiendo limitarse a probar la defensa especialmente alegada. *Atchison T. & F. R. Co.* v. *Dickey,* 41 Pac. 1073; *Continental Ice Co.* v. *Mitchel,* 112 So. 239; *American Car & Foundry Co.* v. *Uss,* 211 Fed. 862; *Texas Midland R. R. Co.* v. *Brown (Texas Court of Civil Appeals),* 207 S. W. 340; *Heriford* v. *Kansas City Rys. Co.,* 220 S. W. 899.

En el caso de *Hall* v. *City & County of San Francisco,* 206 Pac. 459, resuelto por la Corte Suprema de California, se probó que las demandantes iban en un automóvil en el

momento de pasar de sur a norte por la calle Octavia en San Francisco. El accidente ocurrió a las 8:30 de la noche. Guiaba el automóvil uno de los jóvenes que acompañaban a la demandante. En esos momentos uno de los tranvías de la demandada iba a pasar de este a oeste por la calle Geary. La colisión ocurrió en el espacio de intersección cubierto por ambas calles. Basada en estos hechos la demandada solicitó de la corte que sometiera al jurado determinada instrucción. Esta solicitud fué denegada. La Corte Suprema de California, sosteniendo la decisión de la corte inferior, se expresó en los siguientes términos:

"La defensa de negligencia contribuyente es una defensa afirmativa que debe ser alegada y probada por el demandado a fin de obtener los beneficios de la misma. En el presente caso hubo prueba al efecto de que el tranvía tenía encendida la luz delantera acostumbrada, y que ésta era claramente visible a una distancia de 200 pies antes de llegar al cruce. El jurado muy bien pudo haber creído que el conductor del automóvil no miró en esa dirección, o que, viendo el tranvía no creyó que hubiera peligro al tratar de cruzar frente al mismo. La instrucción se refiere casi exclusivamente a la cuestión de la negligencia del conductor del automóvil, y tenía la tendencia directa de inducir al jurado a creer que si el *chauffeur* fué culpable de negligencia contribuyente, los demandantes no podían obtener indemnización alguna. El dar tal instrucción al jurado hubiera sido erróneo toda vez que no se suscitó la defensa de negligencia contribuyente. Sin resolver nada sobre esta instrucción creemos que por este motivo la corte estuvo acertada al negarse a darla. Las otras instrucciones de la corte cubrieron ampliamente la cuestión de negligencia por parte de las personas que conducían el tranvía.

"La instrucción ilustra los peligros que se corren al tratar de dar una instrucción al jurado basada en extractos aislados de las opiniones de esta Corte. Se alega que ella fué tomada de la opinión emitida en el caso de Arnold v. S. F. etc. Co., 175 Cal. 1, 164 Pac. 798. En dicho caso la corte discutía la cuestión de negligencia contribuyente por parte de la persona perjudicada, en relación con la supuesta negligencia del conductor del tranvía. En ese caso la cuestión de negligencia contribuyente fué presentada como defensa, y los pasajes de donde se tomó la instrucción trataban de ambas cuestiones, fundadas en la teoría correcta de que aunque el motorista del tranvía

fué negligente, el demandante no podía obtener una indemnización a su favor si la negligencia de la persona perjudicada contribuyó al accidente. Esta doctrina no podría aplicarse a un caso en que no se alegara negligencia contribuyente, sin tener la tendencia de inducir al jurado a creer erróneamente que tal cuestión estaba en controversia.''

■ Las disposiciones de nuestro Código Civil, en lo relativo a negligencia, constituyen la fuente de nuestra jurisprudencia. No estamos obligados a regirnos por el derecho común ni por la interpretación que hayan merecido a las cortes americanas los estatutos de sus respectivas jurisdicciones. Es natural que nos atengamos a nuestra propia legislación y que adoptemos aquellos principios que surgen de su interpretación y que están en armonía con nuestro derecho civil. La jurisprudencia americana es variada y abundante y constituye para la mente judicial una fuente de provechosa información. Leyendo esta jurisprudencia podemos penetrarnos del desarrollo de la doctrina de la negligencia contribuyente desde sus comienzos hasta nuestros días, sin excluir la negligencia comparativa, adoptada en un número de países cuya legislación tiene su origen en el derecho civil, que estuvo en boga en alguno que otro de los Estados de la Unión y que ha encontrado cabida en algunas disposiciones emanadas del poder legislativo. El principio de que la persona que sufre daños en virtud de su propia negligencia carece de causa de acción, no es exclusivo del derecho común. También el derecho civil en sus orígenes sostiene el mismo principio. *Quod quis ex culpa sua damnum sentit, non intelligitur damnum sentire.* Digesto de Justiniano, tomo 3°., libro 50, título 17, 203. Esta regla tiene sus excepciones tanto en el derecho común como en el derecho civil: en el primero, cuando resulta aplicable la doctrina humanitaria o de la última oportunidad; en el segundo, cuando se acepta y aplica la doctrina de la negligencia comparativa, que, sin destruir el derecho de acción del demandante, produce el efecto de reducir proporcionalmente la

cuantía de la indemnización. Esta corte ha aceptado y aplicado en repetidas decisiones la negligencia contribuyente. Huelga discutir en estos momentos, por considerarlo innecesario, el alcance que pueda tener la aceptación de esta doctrina.

*Por las razones expuestas, entendemos que no ha lugar a la reconsideración solicitada.*

El Juez Asociado Señor Wolf disintió.*