[Civ. No. 14777.   First Dist., Div. Two.   June 14, 1952.]

BESSIE A. LLOYD, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 14778.   First Dist., Div. Two   June 14, 1952.]

LILLIAN M. LLOYD, an Incompetent Person, etc., et al., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

Arthur B. Dunne and Dunne, Dunne & Phelps for Appellants.

Howard H. Desky and Nichols, Richard, Allard & Williams for Respondents.

GOODELL, J.—In one action Lillian M. Lloyd, an incompetent person* (by Harold E. Lloyd, her guardian *ad litem*) and Harold E. Lloyd, her husband, sued the railroad company and five of its employees for personal injuries sustained by Lillian, and for the death of Donald Lloyd their son aged about 4. In another action Bessie A. Lloyd, the mother of Harold, sued the same defendants for personal injuries which she had sustained. The actions were consolidated and tried together and in the first case the judgment was for $75,000 in favor of Lillian and her husband for her injuries, and $5,000 for the death of their son while in the second Bessie A. Lloyd was awarded $15,000.. A motion for judgment notwithstanding the verdict was made in each case and denied, and a motion for new trial in each case was likewise made and denied. These appeals followed.

The actions arose out of a collision between the 1939 Buick driven by respondent Harold E. Lloyd, and a Southern Pacific

*Incompetent as a result of the injuries sued on.

locomotive and tender engaged in switching operations just north of Modesto.

In the late afternoon of December 31, 1948, the Lloyd family set out from their home in Oakland to visit Lillian Lloyd's sister, who lived in Atwater. Harold Lloyd drove, and with him in the front seat were his wife and Donald; in the back seat were Bessie Lloyd and another son, Harold Jr., aged 7 or 8.

The collision occurred at about 6:50 p. m. on Highway 99 about a half mile northerly of the northerly city limits of Modesto at a point where that highway is intersected by a county road and by a railroad track as well. The track crosses the highway at an angle of about 45 degrees.

The Southern Pacific main line parallels the highway to the west. East of the highway there are industries, including an icing plant of the Pacific Fruit Express, and the track which crosses the highway runs from these industries lying east of the highway to the main line on the west thereof. At the time in question the locomotive was pulling three refrigerator cars from the icing plant over to the main line group of tracks. The locomotive was backing, hence the rear end of its tender was the front of the train as it crossed the highway from southeast to northwest. The locomotive was not a switch engine, but a road engine, and the tank on the tender was cylindrical in shape.

The front of the Buick came into violent contact with the left rear corner of the tender which for the time being was the right front corner of the train's leading unit as it moved across (at about 6 miles per hour). Donald, in the front seat, was killed, Lillian Lloyd sustained extremely serious injuries, and Bessie Lloyd was injured less seriously.

The train crew consisted of a conductor, an engineer, a fireman and two brakemen. All five were joined as defendants, but the actions were dismissed as to the brakemen.

The claim of negligence is the alleged failure of the defendants to sound any warning signal by bell or whistle, or to have the "headlight" on the rear of the tender lighted as it approached and crossed the highway. The crew members testified that the bell was ringing and the rear-end "headlight" lighted before they started across and that both were actively functioning at the time of impact. Harold Lloyd and his mother testified that they heard no bell and saw no light on the engine or tender. They testified, however, that all the windows of their car were up (although the little wing

in front of the windows might have been open for ventilation).

The principal question on appeal is whether the respondent Harold E. Lloyd was guilty of contributory negligence as a matter of law.

The testimony of the train crew, on the one hand, that the bell was ringing and the rear-end headlight burning, and the testimony of the Lloyds, on the other, that they heard no bell and saw no headlight created a conflict (see *Reynolds* v. *Filomeo*, 38 Cal.2d 5, 10 [236 P.2d 801], and cases cited) and for the purpose of the discussion of contributory negligence we must assume that the bell was not ringing and the "headlight" was not lighted.

The following facts are established by plaintiffs' witnesses without dispute: that Lloyd had driven over this crossing eight or ten times before; that the night was rainy, misty, with a spotty fog and very poor visibility. Lloyd testified that the night was "very dark, very gloomy," and that as he drove southerly from Manteca the pavement was wet. "It had to be wet," he said, "The windshield had water running off it from the windshield wipers, and had had for some time."

There were several warning signs indicating a railroad crossing, including an illuminated panel suspended over the highway along the approach to the intersection. Lloyd testified that he saw no overhead signs, but admitted seeing a painted crossing sign on the highway. This was sufficient to put him on notice, so there is no need to discuss the other signs. This crossing sign painted on the surface of the highway was 345½ feet northerly of the crossing.

Highway 99 was divided by an "island"; the southbound half was 26 feet wide with two lanes, and the northbound half likewise. Lloyd was driving in the right-hand lane of the southbound half.

On direct examination Lloyd testified that he had been following another car for some time, at a distance of 75 to 100 feet; that his headlights were on the driving beam; that for the last several miles before the collision he had been traveling "at around 40 to 50 miles per hour." When asked if he knew he was coming to a railroad crossing he answered: "Yes. I took my foot off the foot-feed at about, oh, 300 feet—I seen cross-marks in the pavement indicating a railroad crossing." He then testified: "Q. What was the first indication that you had that there was anything wrong

ahead at all? A. The car in front of me put on its brakes and swerved to one side, to the right . . .

"Q. How far ahead of you . . . would the lights light up the roadway, can you tell us? A. Thirty—maybe 30 feet.

"Q. What was there that restricted it to that amount? A. Well, the fog, or the mist. You could see the shininess off the pavement.

"Q. When the automobile that was ahead of you swerved, was it in your lane? A. Yes, sir, it was right directly in front of me, in my lane.

Q. In which direction did it swerve? A. It swerved to the right.

"Q. What did you do? A. Soon as it swerved out of the path I was driving in I seen a dark object. I had my foot on the brake at that time when it swerved, because that is danger, when a car does that. I put my foot on the brake, and immediately I seen this big object in front of me, and I put them on as hard as I could. .

"Q. Was there any light of any kind that you saw on that object? A. No, sir, not on that object.

"Q. Were you looking ahead all the time as · you went down the road? A. Yes, sir.

"Q. Did you hear any bell or any whistle sounded, in the car? A. No, sir, not a sound.

"Q. How far would you say you were away from where the accident happened when you got your brake on? A. Thirty to fifty feet, maybe.*

"Q. Do you know whether or not your car changed its course at all? A. Yes, it did. I felt it swerve when the brakes were applied . . ."

The witness testified that when he saw the object ahead of him it looked "like these oil tank cars." He did not remember the impact.

On cross-examination he testified that as he approached the crossing he saw no overhead signs but did see the "RR" and "X" painted on the highway, and "knew from experience that that indicated that there was a railroad crossing ahead." He testified that after passing over that sign the taillights of the automobile ahead flared up and swerved to the right, and in the interval between seeing the crossing marks on the highway and seeing the taillights flare up and swerve, he was looking at the road straight ahead, and at

---

*A 51-foot skid-mark led into the point of impact.

the car at the same time, and saw nothing but the taillights until the car ahead went clear off of the road, whereupon he saw for the first time "this big black object, the tank" and up to that time he had seen no light except the taillights of the automobile ahead. He added: "I remember a light way up high. It was foggy; I mean, you know, it was kind of a hazy like light.

. . . . . . . . . . . . . .

"Q. Now . . . when these automobile taillights flared up and swerved to the right and you saw a black object, what, if anything, did you do with your brakes? . . . A. I immediately took my foot off the foot feed and put it on the brake . . .

"Q. At that time your speed was 40 to 50 miles an hour, was it not? A. Yes, sir . . .

"Q. When you took your foot off the foot feed and applied your brakes, what then happened? A. I didn't say I applied my brakes at that time. I simply put my foot on the brakes until the car went clear off the highway, and that is when I put my brakes on.

"Q. . . . So when the taillights flared up and swerved, you then took your foot off the foot feed? A. And jammed it on the brake . . .

"Q. How long after? A. Just a split second.

"Q. When was it with respect to seeing this [train] object ahead of you that you applied your brake? . . .

"The Witness: Immediately at that time . . .

"Q. And not when you saw the taillights flare up and swerve to the right? A. I didn't put my brakes on hard at that time, no, I just slowed down.

"Q. Now, . . . immediately before you applied your brakes, your speed was 40 to 50 miles an hour? A. Yes.

"Q. Now, when this object showed up, what was it that you saw? A. Just like I told you, just a big black tank."

On redirect examination Lloyd testified: "Mr. Nichols: This is Exhibit D . . . and it shows . . . some marks across the highway . . . After you saw those lines, did you look in either direction to see if there were any lights coming off the highway?

"A. Yes, sir—I took my foot off the foot feed——

"Q. What looking did you do? A. I looked both directions.

"Q. Did you see any light of any kind? A. No, sir, nothing only a street light maybe, is all I could see.

"Q. You had been over that highway before and knew that there was a track across the highway there? A. Yes, sir . . ."

On further cross-examination he testified: "Q. You knew at that time that you couldn't see more than 60 feet ahead of you in the light of your own headlights, didn't you? "A. I could see the taillights of the car in front of me.

"Q. . . . You knew that from the lights of your own headlights you could not see more than 60 feet ahead of you, didn't you? A. I don't know how to answer that, your Honor.

"The Court: Well, just take your time and think it over.

"The Witness: I have answered it in the way that I would answer it . . .

"Mr. Dunne: I will put another question, Your Honor.

"Q. On that road, on that night, at the time you ran over those white lines on the surface of the highway, how far ahead of you would your lights show up an object the size of a man on the highway? A. 50 to 60 feet.

"Q. And that had been the condition substantially since you left Manteca, had it not? A. No, it was spotty. I mean, it was what I have heard, the expression, truck drivers call 'leopard fog,' or whatever you might say.

"Q. What was the condition at this point, heavier or lighter than it had been at other spots from Manteca? A. All I know, it was very dark, very gloomy."

So much for respondent Lloyd's testimony.

Appellants say that Lloyd "was blindly following the taillights of an automobile ahead of him, according to his own story." This might well have been the case. However this may be, there is nothing in the record to show what became of that car after it swerved to the right and went off the road in what must have been an extremely narrow escape from collision with the tender.

Another feature of this collision should be noted in order to round out the facts. Lloyd's car was being followed at a distance of 700 feet or more by another car, the driver of which was one of plaintiffs' witnesses. He testified that as he neared the scene of the accident, driving at 40 or 45 miles per hour, "It was dark, and . . . was raining in spots," and the visibility was very poor. He heard no bells and saw no headlight. He heard the crash when he was about 300 feet north of the "RRX" lines painted on the highway. Although he heard the crash he continued driving

without putting on his brakes. He said "I didn't see no immediate danger to myself, so I didn't stop; I kept coming. I noticed these taillights." When asked "And how close would you say you got to the train before you could see there was a train there?" he answered "Well, I pulled out in the left-hand lane and I started to pass these taillights, and I got within two car [automobile] lengths of the train before I noticed there was a train there." Thus he steered to the left, shifted into second gear, got into Coldwell Road (the same intersection as that in which the tracks are laid) and cleared the wreck, apparently with not too much time or space to spare. Appellants argue that if this witness could have so maneuvered safely to the left, Lloyd could have done so if he had been at all alert and had his car under any kind of control.

The crossing was not attended (or supposed to be) by a flagman nor was it equipped with a wigwag or other moving or automatic warning signal. It was therefore not a "guarded crossing" as illustrated by numerous cases (among them *Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848] and *Spendlove* v. *Pacific Elec. Ry. Co.*, 30 Cal.2d 632, 634 [184 P.2d 873]) which show that guarded crossings are in a class by themselves. The same authorities hold that even at such crossings, where a driver is encouraged to relax his vigilance he cannot place blind reliance on the signals but must still exercise ordinary care.

The question now presented is whether Lloyd was guilty of contributory negligence as a matter of law. In *Loftus* v. *Pacific Elec. Ry. Co.*, 166 Cal. 464, 467· [137 P. 34], the court said: "Ordinarily, of course, the question whether a plaintiff has been guilty of contributory negligence is one of fact for the jury. It becomes a question of law for the decision of the court only where the facts are undisputed, and, even then, only where, on those facts, reasonable minds can draw but one conclusion on the issue of plaintiff's negligence. [Citations.] 'It has often been said by this court that it is very rare that a set of circumstances is presented which enables a court to say, as a matter of law, that negligence has been shown. As a general rule, it is a question of fact for the jury . . .' (*Seller* v. *Market St. Ry. Co.*, 139 Cal. 268, 271 [72 P. 1006].)"

In *Koch* v. *Southern Calif. Ry. Co.*, 148 Cal. 677 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A.N.S. 521] the crossing was equipped with gates which at the time of

the accident were open when they should have been closed. The trial court directed a verdict for defendant because of plaintiff's contributory negligence in driving heedlessly through them. In affirming the judgment the court said: "Of course, in any case such as this, *where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury.* But where, as here, the unconflicting evidence shows that he exercised no care whatsoever, it becomes a question of law to say whether or not such a plaintiff's case shall be submitted to the jury." (Emphasis added.) The statement that Koch had "exercised no care whatsoever" indicates that the earlier language, which we have emphasized, was not necessary to the decision. (See remarks of Mr. Justice Schauer in his dissent in the Spendlove case, 30 Cal.2d 641.)

However, in the Spendlove case, *supra,* at page 636, in reversing judgments of nonsuit the court said: "Here the jury could have found that the driver relaxed his vigilance in reliance upon the wigwag, and we cannot say as a matter of law that he was negligent in failing to look to the north sooner than he did. He took more precautions for his safety and that of his passengers than did the driver in the Startup case, and we held there that 'where it is shown that a [driver] has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by a jury.' (29 Cal.2d 866, 871 [180 P.2d 896]; *Koch* v. *Southern Calif. Ry. Co.,* 148 Cal. 677, 680 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A.N.S. 521].)"

The Spendlove case had first been before the District Court of Appeal (177 P.2d 27) where the judgments of nonsuit were affirmed and where four cases were cited by the court in support of its holding that the driver was guilty of contributory negligence as a matter of law under the look and listen rule. All of them are now relied on by these appellants. (*Koster* v. *Southern Pac. Co.,* 207 Cal. 753 [279 P. 788]; *Heroux* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal.App.2d 401 [82 P.2d 620]; *Guyer* v. *Pacific Elec. Ry. Co.,* 24 Cal. App.2d 499 [75 P.2d 550] and *Jones* v. *Southern Pac. Co.,* 34 Cal.App. 629 [168 P. 586].) The Supreme Court, however, in reversing the judgments of nonsuit, distinguished those cases. ▮ It thus appears that that court has now adopted or restated the rule of the Koch case, and we of course are

bound to follow it if there is any evidence in this record that Lloyd exercised *some* care—whatever the quantum thereof. He testified that when he saw the "RRX" sign on the surface of the highway he took his foot off the accelerator and looked in both directions. Under the rule of the Spendlove case this seems to be sufficient to make the question one for the jury. The same rule was followed in the Startup case, *supra,* 29 Cal.2d 866, and by this court in *Correa* v. *Davis,* 69 Cal.App. 180, 182 [230 P. 984]. In *Andre* v. *Allynn,* 84 Cal.App.2d 347, 354 [190 P.2d 949], the court in speaking of the Spendlove case says: "This last decision illustrates the fact that in the last few years the tendency of the Supreme Court has been away from the stricter view of preceding years, where frequently contributory negligence was established as a matter of law, to the present situation in which such cases 'are rare.' (See *Anthony* v. *Hobbie, supra* [25 Cal.2d 814, 818 (155 P.2d 826)].)"

For these reasons there is no need to discuss the numerous authorities relied on by both sides on contributory negligence and on the look-and-listen rule, dealing, as they do, with as many different factual situations as there are cases.

Appellants contend that there was prejudicial error in the refusal of the following instructions: "Sometimes accidents happen and persons are injured when there is no fault on the part of any party involved in the accident. Such accidents are called inevitable or unavoidable accidents. If you find that the accident out of which this case arises was an unavoidable accident, then plaintiffs are not entitled to recover anything, and your verdict must be against the plaintiffs and in favor of defendants."

Respondents cite the familiar rule (24 Cal.Jur. pp. 806-810) that it is not error to refuse an instruction if the subject matter thereof is substantially incorporated in those given, and point to the following instructions which were given:

"Negligence is not based upon the possibility of avoiding an accident. The defendants cannot be held liable for negligence merely because they might have avoided the accident had they acted differently. If the defendants did all that ordinarily prudent persons would have done in the same or similar circumstances to avoid the accident in question, the defendants are not chargeable with negligence and may not be held liable in the present case."

"You may not return a verdict against defendant[s]

. . . merely because an accident happened and injury and death resulted from it.

"You must not assume or find, merely because it is undisputed that an accident happened, that there was negligence on the part of any defendant or that any defendant is legally responsible for the happening of the accident or for the result of the accident."

Recent decisions have served to clarify this subject. The case of *Jolley* v. *Clemens*, 28 Cal.App.2d 55 [82 P.2d 51] contains a lengthy discussion of the question, which the Supreme Court commends in *Polk* v. *City of Los Angeles*, 26 Cal.2d 519, 542-543 [159 P.2d 931]. In the Polk case it is said that "the so-called defense of inevitable accident is nothing more than a denial by defendant of negligence or a contention that his negligence, if any, was not the proximate cause of the injury. It is not an affirmative defense and the burden of proof rests upon plaintiff to prove negligence and proximate cause by a preponderance of the evidence . . ." and in *Parker* v. *Womack*, 37 Cal.2d 116, 121 [230 P.2d 823], the court, after quoting the Polk case, said that the defense of inevitable accident "need not be specially pleaded, but is raised by a general denial of negligence [citations]."

In view of these declarations it may be said here as it was in *Jaeger* v. *Chapman*, 95 Cal.App.2d 520, 523 [213 P.2d 404], that "while it would not have been error to have given such an instruction, it was not error to refuse to give it where all elements of defendant's liability were covered by other instructions."

The following cases hold definitely that there is no error in refusing such an instruction: *Stein* v. *United Railroads*, 159 Cal. 368, 373 [113 P. 663]; *Groat* v. *Walkup Drayage Etc. Co.*, 14 Cal.App.2d 350, 355 [58 P.2d 200] (hearing denied); *Fraser* v. *Stellinger*, 52 Cal.App.2d 564, 567 [126 P.2d 653] (hearing denied); *Gunter* v. *Claggett*, 65 Cal.App.2d 636, 642 [151 P.2d 271]; *Guay* v. *American President Lines, Ltd.*, 81 Cal.App.2d 495, 513, 514 [184 P.2d 539] (hearing denied) and *Jaeger* v. *Chapman*, *supra*, 95 Cal.App.2d 520, 523.

"An unavoidable accident is, of course, one not caused by the fault of any of the parties" (*Gunter* v. *Claggett*, *supra*, p. 642) and the opinion in *Parker* v. *Womack*, *supra*, page 121, cites as examples six cases involving accidents "proximately caused by circumstances beyond the control of an ordinarily prudent person." What has been said by us herein

is limited to the instant case, which is not within that class.

*Parker* v. *Womack, supra,* is said by appellants to set this question at rest, but we think not. There an unavoidable accident instruction was given, and the trial judge, having been convinced on a motion for new trial that he had erred in giving it, granted the motion. If it was prejudicial error to give it he was right; if not, he was wrong, since his ruling put the defendant, who had won the first verdict, to a new trial. *Parker* v. *Womack* holds that the giving of the instruction was not prejudicial error, hence that the court erred in granting the new trial. But the holding that it was not prejudicial error in that case to *give* the instruction, does not mean that it was prejudicial error in this case to *refuse* it. The question arose in the two cases in altogether different ways.

■ Several instructions were given with respect to crossing regulations of the Public Utilities Commission. One read as follows: "There is a presumption that the . . . Commission performed its official duty, and accordingly, there is a presumption as to the particular crossing here in question that the . . . Commission, in the exercise of its exclusive power, determined the protection required to be installed at the crossing involved and determined what appliances or devices were necessary, and prescribed what they should be. There is also a presumption in this regard that any railroad using the crossing performed its duty and that there were installed such protective devices and appliances as were prescribed by the . . . Commission. *However, these presumptions to which I have just referred are not conclusive."* (Emphasis added.) Appellants complain that the qualification just emphasized was unwarranted because there was no evidence to controvert the presumptions.

They complain also of the following instruction: "Defendant Southern Pacific Company was free, however, to install warnings at or near the crossing beyond those required by any order of the . . . Commission, and it was its duty so to do if the exercise of reasonable care made such installations necessary."

They complain also of the following: "The fact that defendant Southern Pacific Company was not required by law to provide warnings and other safety devices at the crossing involved other than standard crossing signs, to which I have just referred, did not relieve the defendant railroad company of its obligation to exercise reasonable care for

the safety of travelers at the crossing, and if an ordinarily prudent person, in the exercise of ordinary care, would have supplied additional warning and safety devices over those that were present at the time, then in those circumstances Southern Pacific Company would be required to furnish such warning and safety devices.''

The basis for all three attacks is that the court in so instructing ''usurped the exclusive jurisdiction of the Public Utilities Commission.''

It is settled by *Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111, 126 [137 P.2d 441] and the cases it cites, that regulations such as those under discussion prescribe only the minimum measure of care required and that the jury is free to conclude that the circumstances may require the railroad to do more. The instructions on the whole subject were fair to both sides.

Complaint is made of the failure to give defense instructions 38 and 39 which went into considerable detail with respect to the situation just before the collision. █ They were refused because the subject had been covered by other instructions. We are satisfied that this was correct, and that the following instruction, in particular, covered the ground:

''So long as the defendant railroad was not guilty of any negligence, it and its employees who were in charge of the operation of the train, until put on notice to the contrary, had a right to operate the locomotive and cars involved toward and over the crossing, and also to assume and presume that any person driving an automobile toward the crossing would perform the duties which the law imposed upon him and would reasonably exercise all his natural faculties of observation and caution and would not attempt to cross the track in dangerous proximity to an approaching train if the same were so open to view that collision with it could be avoided by exercising reasonable care.''

█ The following instruction was refused: ''If, as the plaintiff Harold E. Lloyd drove toward the railroad track and while he was in a position of safety and in a position such that by exercising ordinary care he could have handled his automobile so as to avoid the collision, the locomotive and its headlight were then in plain view and open to his observation, then the locomotive itself, without any other notice or warning, was a warning of danger which the plaintiff Harold E. Lloyd was required to heed and if his negli-

gent failure to do so was the sole proximate cause of the collision, your verdict must be in favor of defendants.''

In complaining that this refusal was error appellants say ''No citation of authority is necessary for the proposition and when a locomotive and its headlight are in plain view the locomotive, without more, is a warning to an approaching motorist.'' Counsel's own statement shows that it was nothing but a commonplace instruction. As said in *Stein* v. *United Railroads*, 159 Cal. 368, 373 [113 P. 663], ''A juror would know that . . . without instruction and it would seem absurd to burden the record with a formal statement of a truth so self-evident.''

Moreover, at least eight instructions were given on contributory negligence which, while not as specific or pointed as this tendered instruction, fairly instructed the jury on the subject and rendered it clearly repetitious.

The same may be said with respect to defendants' tendered instruction reading as follows: ''If the plaintiffs, in view of the physical facts existing at the scene of the accident, had they exercised ordinary care, must have learned of the approach of the locomotive in time to have avoided collision with it, by using ordinary care, then the very fact that the automobile collided with the engine raises a presumption that they did not take the required precautions and did not look or listen . . . or that, having looked and listened, the driver of the automobile endeavored to cross immediately in front of the approaching locomotive, and in either of such events, if so you find, his conduct would constitute negligence proximately causing the accident.''

Defendants requested instructions to the effect that there is no presumption that plaintiffs exercised ordinary care for their own safety. The plaintiffs did not request any instruction that there was a presumption that they *did* exercise such care. It is difficult to see, with the matter thus entirely omitted from the discussion, how there could have been any prejudice suffered by defendants, particularly in view of the numerous and comprehensive instructions on contributory negligence.

The court instructed as follows:

''If you find from the evidence that during the last 100 feet in his approach to the crossing, plaintiff had a clear and unobstructed view of any *lighted* traffic for a distance of 400 feet in both directions along said railroad from said crossing, then I instruct you that said intersection was not ob-

structed within the meaning of the section." (Emphasis added.)

Appellants contend that the court's interpolation of the word "lighted" was prejudicial error.

The instructions on the Vehicle Code's provisions, in their sequence, were as follows:

"I now pass on . . . to a certain provision of the vehicle code to which I referred earlier, and in consideration of this provision you will have in mind the general principles that I told you were applicable in connection with the consideration of the provisions of the law generally. At the outset we have for your consideration what is called the basic speed law of this State, section 510 of the Vehicle Code, which provides that: 'No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent, having due regard for the traffic on, the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.' "

The court then instructed on brakes and stopping distances from 10 to 45 miles per hour and then:

"Section 511 of the Vehicle Code provides that the prima facie lawful speed limit for the operation of automobiles is as follows: [quoting the code] 15 miles per hour 'when traversing a grade crossing of a steam, electric, or street railway, if during the last 100 feet of the approach to such crossing the driver does not have a clear and unobstructed view of such crossing and of any traffic on such railway for a distance of 400 feet in both directions along such railway.' If the driver's view along the railway is impeded by reason of darkness, that darkness may constitute an obstruction to view within the meaning of the statute to which I have just called your attention, and would make applicable the 15 mile an hour provision as the prima facie lawful speed. While a violation of Section 511 does not establish negligence as matter of law and while the determination of whether or not the operation of a vehicle at a speed in excess of the speed specified constitutes negligence is for you to pass upon, the section mentioned is to be considered in that connection in the light of all the circumstances existing at the time." And *then,* after all those preliminaries the court gave the instruction now under discussion and quoted above.

When these Vehicle Code instructions are read as a whole and in sequence it is clear that the jury could not have possibly misunderstood the instruction. The court's prefatory

explanation that "darkness may constitute an obstruction" made the later interpolation of "lighted" readily understandable.

The instructions in this case were unusually clear and comprehensive, and they were fair to both sides. The court at an early stage told the jury that "These instructions are to be regarded by you as a whole. In other words, no instruction is to be considered apart from the context of the balance of the instructions." That rule applies as well in our examination of the instructions in the light of appellants' criticisms of them.

We find no error in the instructions, or elsewhere in the record.

The judgments are affirmed.

Nourse, P. J., and Patterson, J. pro tem., concurred.

The opinion was modified to read as above printed and a petition for a rehearing was denied July 14, 1952.

Appellants' petition for a hearing by the Supreme Court was denied August 11, 1952. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.