DOMINGO FIGUEROA ORTIZ y MERCEDES SANTIAGO DÁVILA, demandantes y apelados, *v.* CENTRAL MERCEDITA, INC., y U. S. FIDELITY & GUARANTY COMPANY, demandadas y apelantes.

Número 11171.

*Sometido:* 1 de junio de 1954. *Resuelto:* 7 de julio de 1954.

*Enrique Báez García*, abogado de las apelantes; *Rafael Atiles Moreu*, abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Este caso envuelve una reclamación de daños y perjuicios en virtud de un choque entre unos vagones empujados por una máquina ferroviaria perteneciente a la codemandada Central Mercedita, Inc., y un vehículo de motor perteneciente al demandante Domingo Figueroa Ortiz, cuyo choque ocurrió al cruzar el vehículo del demandante un paso a nivel del ferrocarril utilizado por la Central Mercedita, Inc., en un camino municipal que conduce de una carretera pública al Barrio Capitanejo, en un punto entre Ponce y Santa Isabel. La Sala de Ponce del Tribunal Superior declaró con lugar la demanda, después de haber formulado varias conclusiones de hechos. Concluyó el tribunal a quo que la única causa del accidente fué la negligencia de la codemandada Central Mercedita, Inc., y que los demandantes no fueron negligentes en forma alguna. Las conclusiones sobre los hechos fueron, en parte, las siguientes:

"2. El día 14 de febrero de 1951, como a eso de las seis o seis y media de la tarde, el demandante Domingo Figueroa, chófer autorizado, dueño del vehículo de motor para pasajeros marca Oldsmobile, Modelo de 1940, del tipo conocido como guagua pisa y corre, con tablilla de licencia pública PA-53-650, la conducía llevando al codemandante Mercedes Santiago Dávila y otro pasajero, por el camino municipal que conduce de la carretera insular núm. 3 al Barrio Capitanejo, en un punto entre Ponce y Santa Isabel. Regresaba del sitio Tiburones, y al cruzar un paso nivel del ferrocarril utilizado por la demandada, Central Mercedita, Inc., fué chocado por 40 vagones de caña vacíos que hacia Bocachica empujaba la máquina Caterpillar núm. 26, propiedad de la Central Mercedita, Inc., y que se hallaba en aquella fecha y hora en servicio de dicha demandada, siendo allí

y entonces conducida y manejada por sus dependientes o empleados José María Rivera y Miguel Vázquez.

"3. Dicho vehículo o guagua tenía ya 10 años y pico de uso y fué comprada en venta condicional por el demandante en $650 seis meses antes del choque. En el momento del accidente era conducida por Figuerca a velocidad moderada, y fué chocada por la parte lateral izquierda de atrás sufriendo tales averías que quedó inservible como vehículo para pasajeros y fué vendida para piezas de repuesto en $75.

"4. Al acercarse a dicho paso nivel, que es uno un poco inclinado, el demandante no vió en el sitio del cruce luces, cadenas, barreras, señales o avisos de peligro que llamaran la atención de quien por allí transitara.

"El demandante no oyó campana, pito o silbato que anunciara la proximidad del tren. Él conocía bien dicho cruce y sabía que cuando el tren de cañas se acercaba al lugar, un empleado de la demandada salía al cruce anticipándose a la máquina y los vagones y hacía señas con una bandera. Él lo había visto en muchas ocasiones anteriormente, y no viendo ninguno, confiado en que no venía tren alguno, siguió con su automóvil a poca velocidad; y cuando ya más de la mitad de su vehículo había pasado sobre la vía, fué chocado, como hemos dicho, por el tren de vagones, siendo lanzada su guagua de la vía sobre las cañas y yendo tras de ella unos 10 vagones que se descarrilaron y apiñaron junto al automóvil.

"El empleado de la demandada, José María Rivera, declaró que él se había bajado del primer vagón y se había adelantado al tren para llegar antes que éste al cruce para hacer señales con una bandera que portaba para tal fin. Dijo que conocía al demandante de vista y lo vió que venía guiando su guagua, "que venía de abajo", y lo mandó parar, o sea, detenerse, pero que el demandante no le hizo caso y siguió adelante para cruzar y "puyó" el vehículo, esto es, le dió más gasolina y que al cruzar "lo cogió" un vagón.

"5. No dimos crédito alguno a ese testimonio de José María Rivera, porque nos pareció inverosímil, pues si el demandante conocía bien dicho cruce por haberlo pasado muchas veces antes y le constaba por la experiencia que al acercarse al mismo siempre salía un empleado del tren con bandera a dar aviso de su proximidad, él no hubiera cruzado la vía si dicho testigo hubie-

ra estado en el paso nivel haciendo señales, y mucho menos, si le hubiera ordenado detenerse como dijo dicho testigo que hizo.

"Para lo que sí damos crédito a la declaración del testigo Rivera es para corroborar la manifestación del demandante en el sentido de que allí había visto muchas veces un hombre haciendo señales con una bandera cuando se aproximaba un tren. En otras palabras, que era uso y costumbre de la demandada, Central Mercedita, Inc., hacer, por conducto de sus empleados, señales para seguridad de los que por allí transitaban cuando operaba en aquel sitio uno de sus trenes de caña.

"El demandante tampoco tuvo aviso de campana o pito que lo pusiera en alerta de peligro. El testigo Héctor Luis Díaz Núñez dijo que no sonó pito alguno y ni José María Rivera, ni el testigo ocular de la demandada, Manuel Pizarro, dijeron que se tocara pito o campana.

"Considerado en el aspecto más favorable a la demandada el testimonio de este último testigo, Manuel Pizarro, quien dijo que cuando se tiró el conductor del tren con la bandera de señales 'sentí el cantazo'; los vagones se amontonaron y la guagua se fué contra la caña de la parte derecha del callejón; podríamos concluir que la demandada trató de cumplir con su obligación de avisar, pero que fué tardío el gesto de dar el aviso, e inútil y, como cuestión de hecho, constituyó un acto de negligencia de los empleados de la demandada el esperar la llegada del tren al cruce para intentar dar la señal.

"Concluímos que dicha demandada en esta ocasión fué, como cuestión de hecho, negligente al no dar señal alguna de la proximidad de los vagones y la máquina que chocaron con el vehículo del demandante.

"7. Creemos que no habiendo visto signos, señales, ni oído alarma alguna al acercarse al paso nivel, el demandante, como cuestión de hecho, no actuó imprudentemente al tratar de cruzar la vía.

"8. En el choque el demandante Domingo Figueroa Ortiz, sufrió una herida en el brazo izquierdo, producida al romperse un cristal del vehículo por el impacto del tren, erosiones en el antebrazo y junto al codo derechos. Lo trató unas dos semanas el Dr. Godreau y pagó a éste honorarios ascendentes a $30 quedándole por pagar aún $15 más. En medicinas gastó $25.

"Por el carácter de las lesiones y el hecho de no haber sido asilado, concluímos que fueron leves los daños; no creemos que

fueran intensos sus dolores y valieran razonablemente más de $300 los daños físicos sufridos.

"9. Mercedes Santiago Dávila, el codemandante, viajaba en el asiento delantero a la derecha de Domingo Figueroa Ortiz. Dijo haber recibido un golpe en el cerebro (tocándose detrás del cuello al declarar) y machucaduras en la pierna derecha. Fué atendido en primera cura en el Hospital Tricoche donde le dieron linimento para que se aplicara a los golpes de que se quejaba. Añadió que unos días después fué a tratarse con el Dr. Godreau, el mismo médico que atendió al demandante Figueroa. Le trató en tres ocasiones y le cobró el doctor $20.

"Por la naturaleza de sus lesiones, la prescripción que se le dió en primera cura; por el tratamiento de sólo tres ocasiones que le dió el Dr. Godreau, que ni siquiera aplicó un vendaje a las lesiones, y los modestos honorarios que cobró ($20) estimamos que sus lesiones fueron de muy escasa importancia y no creemos que sus dos meses sin trabajar se debieran a o fueran el resultado de dichas lesiones, ni que justificadamente los dolores físicos que alega valgan los $600 que pide por ellos."

Las demandadas han interpuesto un recurso de apelación ante este Tribunal y han señalado el siguiente error:

"La Corte a quo cometió error al declarar con lugar la demanda y no considerar la defensa levantada por la parte demandada en su contestación de que el codemandante Domingo Figueroa Ortiz fué culpable de negligencia contribuyente y que, de no haber contribuído dicho codemandante con su propia negligencia, el accidente no hubiera ocurrido."

Aunque las apelantes no señalan específicamente como errónea la actuación del tribunal de Ponce al resolver que la Central Mercedita, Inc., fué negligente y al establecer su responsabilidad, en su alegato las apelantes exponen que esa entidad no fué negligente. Alegan que ella no estaba obligada a mantener en el paso a nivel en cuestión servicio alguno de guardabarreras, cadenas u otros aparatos adecuados de protección, ya que bajo la sec. 3 de la Ley núm. 70 de 1917 (Leyes de 1917, 2, pág. 449), tal obligación surge solamente en "los cruces a nivel de las carreteras públicas insulares y en los demás cruces públicos que la Comisión [de Servicio Pú-

blico] designare." Cf. *Castellano* v. *P. R. Beverages*, 74 D.P.R. 890, 894, 895 y casos allí citados, al efecto de que el no mantener aparatos de protección en otros pasos a nivel que no sean cruces o pasos a nivel de las carreteras públicas insulares o cruces públicos designados por la Comisión de Servicio Público, no constituye negligencia *per se*. El paso a nivel o cruce envuelto en este caso no es un paso a nivel de una carretera pública insular ni es un cruce público designado por la Comisión de Servicio Público. No obstante ello, puede haber negligencia de parte de un ferrocarril o de una compañía ferroviaria por el hecho de no mantener aparatos de protección o señales de aviso en un cruce distinto a los enumerados en la Ley núm. 70 ya mencionada, si, como cuestión de hecho, se ha establecido el uso general y público de tal cruce, y se ha establecido la costumbre y el hábito del público, de transeúntes, vehículos de motor y de la propia compañía ferroviaria, de utilizar el sitio en cuestión como un paso a nivel o cruce público. Tal como se indica en el caso de *Jones* v. *Atlanta-Charlotte Air Line Ry. Co.*, 63 S.E.2d 476, 479, resuelto en el año 1951, la regla aceptada por la mayoría de las jurisdicciones es al efecto de que un ferrocarril tiene la obligación de anticipar la presencia de personas (o vehículos) en un cruce, en un camino bien definido, en un sitio en que la compañía ferroviaria ha aceptado la realidad de un uso general (aunque no constituya un uso legalmente establecido en forma específica), o cuando las circunstancias sean tales que la presencia de personas (o vehículos) en o cerca de las vías en ese sitio particular puede ser razonablemente esperado. (Véase además, 120 A.L.R. 184). Si una compañía ferroviaria ha establecido la costumbre de establecer aparatos de protección y señales de aviso en un cruce determinado, hasta el punto de que el público ha adquirido conocimiento de esa práctica y descansa razonablemente en la continuación de esa costumbre, el hecho de no usar o colocar tales aparatos de protección o señales de aviso en determinado momento, puede constituir un indicio de negligencia. 44 Am. Jur. 765, sec. 521; 16

A.L.R. 1285; 71 A.L.R. 1175; *Case* v. *Northern P. Terminal Co.*, 160 P.2d 313. Específicamente, si se ha establecido la costumbre de usar guardabarreras o personas que den los avisos o señales correspondientes, el dejar de utilizarlos en un momento determinado puede constituir negligencia. 44 Am. Jur. 770, sec. 526; 24 A.L.R.2d 1166. Un viajero tiene el derecho a esperar que las señales usualmente acostumbradas se continuarán dando por una compañía ferroviaria, en un sitio frecuentemente usado como un cruce, cuando la compañía ha establecido una práctica bien conocida de dar señales y tener guardabarreras, y la omisión de así hacerlo es un hecho a ser considerado por el tribunal al resolver si ha mediado negligencia. *Midland Valley Ry. Co.* v. *Shores*, 136 Pac. 157. El peso de las autoridades es al efecto de que el deber de un ferrocarril de dar señales de que está a punto de cruzar un paso a nivel es aplicable a cruces que no sean técnicamente tales, pero que se usen realmente como cruces. 44 Am. Jur. 612, nota 3. Los requisitos establecidos en cuanto a las precauciones que deben tomarse en un cruce en el funcionamiento de trenes son aplicables, no solamente a los cruces en vías públicas formalmente reconocidas, sino también a los cruces que sean públicos como cuestión de hecho, en virtud de su dedicación al uso público. 74 C.J.S. 1380; *Gregoriev* v. *Northwestern Pac. Ry. Co.*, (Cal.) 273 Pac. 84.

En el caso de *García* v. *Am. Ry. Co. of P. R.*, 45 D.P.R. 762, 766, se dice lo siguiente:

".... Cuando los hechos demuestran que la carretera ha adquirido el carácter de pública, la compañía ferroviaria no puede alegar la falta de actuación por parte de la comisión para evadir los deberes que le impone la ley y que exigen la seguridad y la protección de las personas que caminan por la carretera y atraviesan el cruce. Una carretera pública puede surgir sin necesidad de que así lo declare la Comisión de Servicio Público . ...."

En el caso de *Pueblo* v. *Pagán*, 49 D.P.R. 436, se dice lo siguiente, a la página 445:

"Podemos decir que hemos examinado toda la prueba practicada y nos inclinamos a creer que el jurado estuvo acertado en la apreciación de la misma. Alega el acusado que de acuerdo con la jurisprudencia el maquinista de la locomotora no tiene necesidad de tocar pito al acercarse a un cruce privado. Estas reglas no son absolutas. Hay que tener siempre en cuenta las circunstancias particulares de cada caso. La misma jurisprudencia reconoce sus excepciones. El cruce donde ocurrió·el accidente se utilizaba frecuentemente por los trabajadores de la colonia 'Río Jueyes' y el público tenía acceso al referido cruce. En Puerto Rico, existe además la Ley núm. 70 de 1917, que en su artículo tercero, letra *q*, dice lo siguiente:

" 'Si se tratare de una compañía de ferrocarril etc., deberá instalar en sus locomotoras campanas y silbatos, que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles siempre que fuere necesario como advertencia de la aproximación de dichas locomotoras y trenes, los que reducirán la velocidad al mínimum en los cruces de calles.'

"Esta ley, a juicio de la defensa, se refiere únicamente a cruce de caminos públicos o calles. Asumiendo, sin admitirlo, que la ley sea susceptible de esta interpretación, las circunstancias que concurren en este caso, de acuerdo con la jurisprudencia, sostienen el veredicto del jurado. La prueba demuestra que la compañía y el propio acusado tenían conocimiento de que el sitio del accidente se utilizaba con frecuencia como vía de tráfico. Dentro de estas circunstancias, las personas que acostumbraban cruzar la vía tenían motivos para esperar una señal del tren al aproximarse al cruce. Se ha demostrado que cuando ocurrió el accidente había árboles y cañas alrededor de la vía, que impedían la vista considerablemente. Las cañas estaban bastante crecidas y los árboles también. Hubo prueba contradictoria en cuanto a la visibilidad del tren al penetrar una persona en el paso a nivel, pero el jurado apreció la prueba y a nuestro juicio ha quedado demostrado que la visibilidad quedaba bastante obstruída.

"Hemos citado anteriormente el caso de *Ferrer e Hijo* v. *American Railroad Co.*, donde, a pesar de no tratarse de un cruce enteramente público, se resolvió que la compañía ferroviaria tenía el deber de dar algún aviso y de usar el cuidado ordinario."

▮ Efectivamente, el hecho de que el cruce donde ocurrió el accidente en el caso de autos no haya sido reconocido oficialmente como un cruce público, no excluye el hecho real,

de acuerdo con las conclusiones del tribunal a quo que están sostenidas por la prueba, de que el paso a nivel en cuestión había sido usado generalmente como un cruce público, y que era la costumbre de la codemandada Central Mercedita, Inc., conocida por los demandantes y el público en general, el de usar aparatos de protección y señales de aviso en ese cruce, al aproximarse un tren. La omisión de tal codemandada de tomar tales precauciones inmediatamente antes de ocurrir el accidente, fué un factor constitutivo de negligencia. El hecho de que el cruce no estuviese localizado en una carretera pública, y de que no fuese reconocido como cruce público por la Comisión de Servicio Público, no excluía la posibilidad de que la Central Mercedita, Inc., hubiese sido negligente al no cumplir, al ocurrir el accidente, con su costumbre usual de tener allí guardabarreras y las señales o avisos correspondientes. La negligencia no debe basarse exclusivamente en disposiciones estatutarias específicas, esto es, la negligencia no es factor exclusivo de incumplimiento de deberes estatutarios. Aun no mediando infracciones a un estatuto o a una disposición gubernamental, puede sobrevenir la realidad de una situación de peligrosidad que dé lugar al deber de actuar con cuidado, de acuerdo con las circunstancias particulares de un caso, surgiendo la negligencia del incumplimiento de tal deber, creado por las exigencias de tal situación real de peligrosidad, independientemente de las disposiciones concretas de un estatuto. Las disposiciones contenidas en la sec. 3 de la Ley núm. 70 de 1917 en cuanto a los deberes de un ferrocarril en un cruce oficialmente reconocido como tal, no deben ser interpretadas en tal forma que se prive a los tribunales de su función de determinar en casos individuales si la conducta de un demandado corresponde a una norma de cuidado razonable de acuerdo con las circunstancias y, por lo tanto, el hecho de que determinada situación no se ajuste a los requisitos del estatuto no impide el que se llegue a la conclusión de que el ferrocarril fué negligente al no suministrar las señales o avisos correspondientes. *Pokora* v. *Wabash Ry. Co.*, 292 U. S. 98;

*Grand Trunk Ry. Co.* v. *Ives*, 144 U. S. 408; anotación en 5 A.L.R.2d 116. Lo resuelto en el caso de *Castellano* v. *P. R. Beverages*, supra, debe ser aclarado al efecto de que, aunque el no usar aparatos de protección en un cruce no reconocido oficialmente como público no constituye automáticamente negligencia *per se*, sin embargo, tal ausencia de reconocimiento legal u oficial no excluye la posibilidad de negligencia, de acuerdo con las circunstancias peculiares de cada caso, en un cruce generalmente usado como público, de cumplirse con las normas reseñadas en esta opinión.

En vista de las conclusiones sobre los hechos del tribunal de Ponce, que ya hemos transcrito, cuyas conclusiones están sostenidas por la prueba presentada, fué negligente la Central Mercedita, Inc. Pero las demandadas-apelantes sostienen especialmente que el codemandante Domingo Figueroa Ortiz fué también negligente al conducir su propio vehículo, ya que al aproximarse al cruce no cumplió con su alegado deber de "detenerse, mirar y oír", (*stop, look and listen*). Ahora bien, no es absoluta la regla de "parar, mirar y oír", esto es, el dejar de detenerse, atender y escuchar no conlleva automáticamente la existencia de negligencia ya que la cuestión relativa a si un demandante que está a punto de cruzar un paso a nivel ha cumplido o no con su deber de actuar con el debido cuidado al no pararse, mirar y oír depende de las circunstancias peculiares de cada caso. 75 C.J.S. 29, 34 *et seq.*, sec. 774; *Toschi* v. *Christian*, 24 Cal.2d 354, 149 P.2d 848, en donde se indica que no se trata de una regla rígida de la ley, no siendo efectiva la doctrina cuando su aplicación resulte ser irrazonable. Ratificamos lo expuesto en *García* v. *Am. R. R. Co. of P. R.*, supra, en donde se expone lo siguiente a la página 769:

"A nuestro juicio el caso de Goodman no debe interpretarse en el sentido de imponer al conductor de un vehículo de motor el deber de detenerse siempre al acercarse a una vía ferroviaria. No parece razonable exigir invariablemente, en todos los casos, de un conductor, que se detenga por completo antes de llegar a

la vía de un tren. La jurisprudencia general no sostiene tal criterio. Háse dicho por un número de tribunales que una persona que se dispone a cruzar la vía de un ferrocarril, manejando un vehículo de motor, debe detenerse, mirar y tratar de escuchar, en un sitio desde donde pueda tender la vista a través de la vía, para ver si se aproxima algún tren. Prevalece, sin embargo, la regla de que, como cuestión de derecho, no es éste un deber que se impone invariablemente al viajero. Las cuestiones en controversia no son siempre las mismas, los hechos varían, y, para juzgar la conducta de un viajero que no haya detenido su vehículo, hay que tener en cuenta las circunstancias que mediaron al acercarse al cruce, su ignorancia o conocimiento de la situación de la vía y la confianza que haya podido tener en sus oportunidades para ver y oír, a un lado y otro de esa vía. Ya hemos dicho que cada caso tiene sus peculiaridades, sus rasgos característicos, su sello especial, su fisonomía propia, y que no sería empresa fácil impartir justicia si para apreciar qué hechos constituyen cuidado ordinario o negligencia tuviésemos que ajustarnos a reglas fijas e invariables. *Rivera* v. *Central Pasto Viejo*, 44 D.P.R. 266 y 267. Para determinar si ha habido o no negligencia en un caso determinado debemos preguntarnos qué hubiera hecho una persona de razonable prudencia en igualdad de circunstancias. No debemos esperar de la naturaleza humana más de lo que humanamente puede dar y no parece razonable exigir precauciones que no se adoptan en el curso ordinario de las actividades humanas, por más que estén justificadas cuando existe alguna razón especial que nos aconseje desplegarlas, velando por la seguridad ajena y por nuestra propia seguridad.

"La cuestión a resolver es si, de acuerdo con los hechos probados, es éste un caso en que ha debido ejercerse o no un cuidado especial por parte del conductor del camión, . . ."

Al mismo efecto véase el caso de *López* v. *American Railroad Co. of Puerto Rico*, 50 D.P.R. 1, en donde, a la pág. 26, después de citar con aprobación lo que hemos transcrito del caso de *García*, se cita el caso de *Pokora* v. *Wabash Ry. Co.*, supra, resuelto por la Corte Suprema de los Estados Unidos, en la forma siguiente:

" 'Se hace necesario aclarar en estos momentos las sombras que puedan oscurecer el punto en controversia. No es nuestro ánimo investigar en estos momentos la existencia de un deber de

parar independientemente de un deber de bajarse del vehículo y practicar un reconocimiento. Esta investigación, si la hiciéramos, nos haría penetrar en un espeso campo de decisiones que están en conflicto. Algunas cortes aplican la llamada regla de Pennsylvania e imponen un deber invariable de parar, como también de mirar y escuchar, sin parar mientes en que el cruce esté despejado o las vías a cada lado. (Citas.) Otras cortes, la mayoría, adoptan la regla de que el viajero debe mirar y escuchar, pero que la existencia del deber de parar depende de las circunstancias y por lo tanto general, sino invariablemente, de la opinión del jurado. (Citas.) El asunto ha tenido menos consideración en esta corte, pero en ninguna de sus opiniones aparece la indicación de que en todo cruce el deber de parar sea absoluto, independientemente del peligro. Ni aun en el caso de *B. & O. R. Co.* v. *Goodman,* supra, que va más lejos que los primeros casos, puede encontrarse apoyo para dicha regla. Por el contrario la opinión establece de un modo claro que el deber está condicionado por la presencia de impedimentos que hagan que la vista y el oído resulten inadecuados para la protección del viajero.' *Pokora* v. *Wabash Ry. Co., 292* U. S. 102."

Véase además el caso de *Línea Borinquen, Inc.* v. *American Railroad Co.,* 54 D.P.R. 30.

Es saludable y socialmente conveniente el principio de que la regla de "detenerse, mirar y oír" no es absoluta, y que su inobservancia no significa negligencia de por sí. La función judicial de investigación de los hechos, y de formulación de las consecuencias jurídicas de los hechos reales, no debe quedar limitada o encerrada férreamente en las categorías rígidas de una regla inflexible. De otro lado, desde el punto de vista del interés social, los ferrocarriles y los vehículos de motor que transitan por la carretera son dos factores coordinados de transportación, que son socialmente útiles, y no se deben imponer gravámenes irrazonables sobre uno de esos dos métodos de viaje. Aunque los derechos y obligaciones de los ferrocarriles y de otros vehículos que utilizan las carreteras son recíprocos, los ferrocarriles están en una posición algo preferente, debido a sus características especiales, en cuanto al uso de vías que limitan su libertad de acción. 44 Am. Jur.

734, 735. Sería irrazonable el imponer a un ferrocarril la carga o gravamen de tener que detenerse en todos los cruces. *Texas & P. R. Co.* v. *Cody*, 166 U. S. 606; *Hendrickson* v. *Union P. R. Co.*, 136 P.2d 438. Pero sería igualmente irrazonable el obligar a los demás vehículos a detenerse en todos los cruces, independientemente de las necesidades reales que surjan de cada situación. Ello constituiría una carga excesiva sobre la transportación pública.

Naturalmente, cuando en determinado cruce público median condiciones inherentemente peligrosas, el conductor de un vehículo de motor debe aumentar sus precauciones. 75 C.J.S. 18; *Baltimore Ry. Co.* v. *Felgenhaur*, 168 F.2d 12; *Dull* v. *Atchinson, Topeka Ry.*, 81 P.2d 158. Puede surgir el deber de estar pendiente de la proximidad de un tren, y de observar y oír en una forma razonablemente efectiva, y el dejar de hacerlo sin una excusa razonable puede constituir negligencia. 75 C.J.S. 25, sec. 773. El conductor de un vehículo puede ser inducido por las apariencias, sin culpa alguna de su parte, a creer que es innecesario el detener el vehículo. Esto es, si como ocurre en el caso de autos, la compañía ferroviaria ha establecido una costumbre, conocida por el demandante, de colocar en un cruce aparatos de protección y dar señales o avisos cuando se aproxima un tren al cruce, y, en determinado momento, al llegar un tren al cruce, la compañía deja de cumplir con esa costumbre y no da tales señales ni pone en funcionamiento tales aparatos de protección, tal omisión constituye una indicación tácita de que, en ese momento, no se aproxima el tren, y constituye una invitación tácita a los conductores de vehículos para que crucen el paso a nivel sin detenerse, pudiendo ser tal omisión una excusa razonable para que no se cumpla con la norma de "parar, mirar y oír". No obstante la omisión del ferrocarril de actuar de acuerdo con su costumbre, el conductor del vehículo siempre debe actuar con cuidado si las circunstancias del caso así lo requieren, pero el hecho de la invitación implícita a que hemos hecho referencia reduce el grado o *quantum* de cuidado requerido de

parte del conductor del vehículo. *Will* v. *Southern Pacific Co.*, 18 Cal.2d 468; *Spendlove* v. *Pacific Electric Ry. Co.*, 20 Cal.2d 632; 184 P.2d 873. En el caso de *Pearson* v. *Baltimore and Ohio Ry. Co.*, 200 F.2d 569, se resuelve que bajo la ley de Indiana, de haber establecido un ferrocarril la costumbre de colocar aparatos de protección y señales de aviso, el conductor de un vehículo de motor tiene el derecho a presumir que, si un tren se estuviese aproximando a un cruce, las señales correspondientes estarían funcionando, y que, aunque el hecho de que las señales no estaban funcionando no relevaría al conductor del vehículo del deber de ejercitar un cuidado razonable para lograr su propia seguridad, tal hecho disminuiría el grado y cantidad de cuidado necesario para que el conductor cumpla con la norma de razonabilidad, y sería relevante en la cuestión de si el conductor fué negligente al no descubrir antes la proximidad del tren. Especialmente en esa situación, no habiendo regla absoluta alguna, la cuestión de si el conductor ha actuado o no con cuidado o ha sido o no negligente, es una cuestión de hecho a ser resuelta primordialmente por el tribunal de primera instancia. *Lloyd* v. *Southern Pacific Co.*, (Cal.) 245 P.2d 583, resuelto en el año 1952. En el caso de autos el tribunal a quo formuló conclusiones de hechos, sostenidas por la prueba presentada, al efecto de que era la costumbre de la Central Mercedita, Inc., conocida por el demandante que conducía su propio vehículo, la de hacer señales con banderas y tocar pitos y campanas cuando un tren se aproximaba a un cruce; que inmediatamente antes del accidente el demandante no vió en el sitio del cruce luces, cadenas, barreras, señales o avisos de peligro, ya que la demandada no dió tales señales, y el demandante tampoco tuvo aviso de campanas o pitos que lo pusieran en alerta de peligro y qué el demandante Figueroa Ortiz conducía su vehículo a poca velocidad. El testimonio del demandante Figueroa Ortiz fué creído por el tribunal a quo. Él declaró que conducía su vehículo en esos momentos a diez o doce millas por hora y que él prestó atención a oír o ver el tren, pero no oyó ningún ruido

que demostrase la proximidad del tren, ni pudo ver el tren, debido especialmente a las obstrucciones del terreno. En vista de ello, no fué claramente errónea la conclusión formulada por el tribunal a quo al efecto de que, como cuestión de hecho, el demandante Figueroa Ortiz no fué negligente, y que la causa única del choque fué la negligencia de la codemandada Central Mercedita, Inc.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Sifre no intervino.